IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

20-CV-6346

KOMITEE, J.
BLOOM, M.J.

---

DAVID C. OGULA

-against-

CITY OF NEW YORK, FIRE DEPARTMENT OF
NEW YORK (FDNY), TERRYL BROWN,
STEPHEN RUSH and DANIEL NIGRO

**Complaint for a Civil Case**

Case No. _____
*(to be filled in by the Clerk's Office)*

Jury Trial:  ☐X Yes  ☐ No
*(check one)*

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 2 1 2020 ★

BROOKLYN OFFICE

---

Plaintiff, on behalf of himself (pending assignment of attorney), complaining of the Defendants, allege the following:

## NATURE OF ACTION

1.      Plaintiff DAVID C. OGULA, individually, (hereinafter named as the Plaintiff) brings this action against Defendants City of New York (hereinafter "City"), Fire Department of New York (hereinafter "FDNY"), "Deputy Commissioner" and "Chief Legal Counsel, (hereinafter "Terryl Brown," collectively and individually "Defendants"), Deputy Commissioner for Budget and Finance (hereinafter "Stephen Rush" or "Deputy Commissioner, Budget and Finance,"

1

collectively "Defendants"), Fire Commissioner (hereinafter "Daniel Nigro" collectively "Defendants") to secure monetary, injunctive and declaratory relief for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, New York State Human Rights Law, New York City Human Rights Law, and other related statutes.

2.      The FDNY consists of uniformed Firefighters, Emergency Medical Services personnel, Fire Protection Inspectors, Fire Alarm Dispatchers and civilian employees. Civilian employees serve in various support bureaus (Human Resources, Budget and Finance, Technology Development, Facilities, Fleet, Technical Services, Health Services and other units). A relatively high percentage of non-white employees or protected minorities (Blacks, Hispanics and Asians) serve in various civil service titles as public employees. This diverse group of predominantly non-white male employees of the FDNY, including the Plaintiff, are put through an internal subjective promotional process that bars advancement to senior managerial positions (namely Deputy, Associate or Assistant Commissioner; Agency Chief Contracting Officer and internally designated positions such as "Executive Director"), for nearly all black male employees (foreign and US born). This process differs in stark contrast to the promotional opportunities for the predominantly white employees of the Fire Department of New York.

3.      The actions and practices of Deputy Commissioners (DC) Terry L. Brown and Stephen Rush, and the FDNY bars black male employees (foreign and US born) from advancing to senior managerial positions.

4.      On May 3, 2019, the New York City Department of Citywide Administrative Services (DCAS) promulgated the position of Associate Commissioner, Manager Level 5, (Job ID: 392910). Plaintiff applied for this position but he was denied the opportunity for consideration for promotion (and even unjustifiably and falsely deemed unqualified for lack of a preferred skill),

2

even though Plaintiff was qualified for a promotional opportunity. Female applicants Ms. Hamblin and Ms. Giraud were treated more favorably on the basis of their sex/gender. The department in which Plaintiff works and has faced discrimination, Human Resources, is predominantly managed by female employees at FDNY. Plaintiff was not considered for interview, nor informed why he was not considered.

5.      By contrast, Ms. Brown selected Ms. Ayana Brooks (a female applicant) as Assistant Commissioner, HR even though she did not have a preferred skill.[1] Ms. Giraud was appointed as Assistant Commissioner, Candidate Investigation Division (CID) even though she did not have a preferred skill.[2] Ms. Brooks and Ms. Giraud were selected for positions to which they applied, even though they did not have a preferred skill[3] but Ms. Brown claimed that the Plaintiff was not qualified for the Associate Commissioner position because the Plaintiff did not have a preferred skill: being an attorney and having legal experience.

6.      The Plaintiff was denied and disparately treated and/or impacted based on unlawful considerations, including but not limited to his race, sex, gender, age, and country of origin, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.*, 42 U.S.C. § 1981, the New York State Human Rights Law (hereinafter "NYS HRL"), the New York City Human Rights Law (hereinafter "NYC HRL"), Administrative Code of the City of New York §§8-101, *et seq.*

7.      Ms. Brown gave Ms. Hamblin and Ms. Giraud preferential treatment, including promotions, despite their employment and performance histories, and lack of HR qualifications. Ms. Brown's treatment of Plaintiff was in stark contrast to the preferential manner in which she

---

[1] Job ID: 379352.
[2] Job ID: 379360.

treated Ms. Hamblin and Ms. Giraud, as more fully explained in the factual allegation section of this case.

8.      Ms. Hamblin was given preferential treatment by having a position specifically created for her (also explained fully in the factual allegation section of this case). Ms. Brown's emails and verbal communications with the Plaintiff made it clear that a position was being created and it was specifically for Ms. Hamblin. The Plaintiff was not similarly treated.

9.      Ms. Hamblin, Ms. Giraud and the Plaintiff were similarly situated because they were supervised by Ms. Brown and were seeking high-level management positions at FDNY.

**A.      Sarcasm and Ridicule**

10.     On a number of occasions, Ms. Brown would use sarcasm to ridicule Plaintiff and to minimize his role within HR.

11.     On about April 30, 2019, Plaintiff was in Ms. Brown's office along with Ms. Hamblin discussing an HR-related matter, when Ms. Brown inquired about what role Plaintiff could play in HR in the future. Plaintiff had not been notified beforehand that this matter would be discussed, and he was not fully prepared to discuss an issue that was of great importance to Plaintiff. This illustrates the lack of consideration to which Plaintiff was subjected.

12.     Terryl Brown used offensive cultural and/or national stereotypes to ridicule the Plaintiff and minimize his role in the FDNY Bureau of Human Resources (HR), among other forms of discrimination and barred him from consideration for a senior management position (Associate Commissioner). Ms. Brown characterized Plaintiff's desire for promotion to a senior management position as "grandiose" and seeking to *"inherit"* or be *"anointed."* These offensive cultural and/or national stereotypes and epithets have been widely used in connection with certain illegal acts[4]

---

[4] Plaintiff has no criminal record nor has he ever made any claim to royalty.

about Africans, and Nigerians[5] in particular. They are drawn from a long-running scam by criminals who claim to be Nigerian royalty asking the would-be victim to assist the supposed prince with transferring vast sums of money that are part of the prince's *"inheritance."* These cultural and/or national stereotypes were repeated in the written FDNY official statement, that the Plaintiff wanted to *"inherit"* a position within HR[6] without being qualified for such position. Terryl Brown also characterized Plaintiff's experience and qualifications as "[complainant's] grandiose view that his experience and longevity in a subordinate position "entitles" him to lead FDNY's Bureau of Human Resources ("HR"), regardless of civil service law and notwithstanding FDNY leadership's assessment[7] of his performance. The aspiration for senior management positions by Bridget Hamblin and Marie Giraud was never characterized with such derogatory language. Plaintiff was subject to these derogatory statements on the basis of his race and national origin. The Court can reasonably infer that Ms. Brown's and FDNY's use of these words have no other basis than their pejorative inferences.

13.    Ms. Brown compared Tunji Adewunmi, a Principal Administrative Associate/non supervisor with the Plaintiff, a manager, apparently to minimize the Plaintiff's seniority, grouping them in the same category. Ms. Brown was aware that both are of the same national origin (Position Statement P 10).

---

[5] *See* Madowo, L., *How the US caught flashy Nigerian Instagrammers 'with $40m'* BBC (July 7, 2019), available at https://www.bbc.com/news/world-africa-53309873 (last visited on November 12, 2020); Leonhardt, M., *'Nigerian prince' email scams still rake in over $700,000 a year—here's how to protect yourself,* CNBC (April 18 2019), available at https://www.cnbc.com/2019/04/18/nigerian-prince-scams-still-rake-in-over-700000-dollars-a-year.html (last visited on November 12, 2020); Cullen, T., *Some Nigerian Prince victims start getting restitution from Western Union over its role in scam;* N.Y Daily News (June 11, 2018), available at https://www.nydailynews.com/news/national/ny-news-nigerian-prince-payback-20180611-story.html (last visited on November 12, 2020); *Washington man who collected millions in 'Nigerian inheritance' scam receives 5-year sentence;* U.S Immigration and Customs Enforcement [Financial Crimes] (December 09, 2011), available at https://www.ice.gov/news/releases/washington-man-who-collected-millions-nigerian-inheritance-scam-receives-5-year (last visited on November 12, 2020).
[6] Position Statement, at P 8 & 9.
[7] *Id.* at P 1; the FDNY has not provided any such formal "leadership assessment" or assessment of Plaintiff's performance. Plaintiff's performance evaluations and awards are to the contrary.

14.     Ms. Brown assigned tasks making a selective gender and subservient inference such as *"Take the laboring oar"* in an official correspondence regarding the posting for Deputy Commissioner for External Affairs and Public Information.

15.     Plaintiff discovered that Ms. Brown was directing assignments and inquiries to Galina Mekhova and Janelle Bennett, both of whom were assigned to the Plan Action Request (PAR) unit.  Ms. Mekhova and Ms. Bennett would subsequently seek Plaintiff's guidance regarding the proper handling of Ms. Brown's inquiry or assignment.  Based on Plaintiff's prior communications with Ms. Brown, it would have been more appropriate for Ms. Brown to refer these matters directly to the Plaintiff. As an HR Manager, Plaintiff was more knowledgeable and in a better position to properly instruct these employees about Ms. Brown's requests. Plaintiff found Ms. Brown's practice to be demoralizing, as it diminished his status as a manager.

16.     Ms. Brown instructed Ms. Janelle Bennett to give an assignment to the Plaintiff ("please ask David Ogula to prepare the documents for the FC's signature", though Ms. Brown was aware that to some extent, Plaintiff oversaw Ms. Bennett's work. Ms. Bennett was not his supervisor. Ms. Brown could have communicated directly with the Plaintiff on this matter, and did not do so.

17.     Ms. Brown, discussed reassignment of duties pertaining to Justin Richards, an HR employee under Plaintiff's supervision at the time, without notifying the Plaintiff.

18.     Ms. Brown subsequently reassigned plaintiff's responsibilities to Justin Richards, who was supervised by Plaintiff and of US national origin.

**B.     Heightened Scrutiny**

19.     On May 31, 2019, Mr. Thomas Dowling of BTDS wrote an email to Ms. Hamblin, in which Mr. Dowling sought approval for the appointment of Mr. Jack Fitzgerald, an employee in the Bureau of Technology Development and Systems ("BTDS"), into the title of Computer Specialist.

6

20.     Over one month later, on July 1, 2019, Ms. Hamblin forwarded Mr. Dowling's request to Plaintiff for review, in which she requested that Plaintiff compare the tasks of the proposed position to employees with similar levels of responsibility. Plaintiff wrote an email to Mr. Dowling in which he requested the names of BTDS employees with similar levels of responsibility.

21.     Mr. Dowling informed Plaintiff that he had sent an email to Ms. Brown on June 6, 2019 that had updated information about the potential appointment of the BTDS employee. Neither Ms. Brown nor Ms. Hamblin had forwarded the June 6, 2019 email to Plaintiff.

22.     Almost a month after Mr. Dowling sent his request to Ms. Brown and Ms. Hamblin, Ms. Hamblin forwarded the request to Plaintiff for a comprehensive review with appropriate comparators. Plaintiff visited Mr. Dowling's office and was able to obtain the email with the updated information. However, Mr. Dowling had not given Plaintiff the names of BTDS employees with similar levels of responsibility, in response to Plaintiff's prior request.

23.     Ms. Hamblin did not respond to Plaintiff's email.  At about this time, Ms. Hamblin went on maternity leave. It should be reasonably presumed that Ms. Hamblin would have had an obligation to notify Ms. Brown of any matters that she was handling which were outstanding, prior to her leave of absence.

24.     On August 22, 2019, Mr. Dowling requested a status report from Ms. Brown.  Ms. Brown scheduled a meeting on that same date and requested that Plaintiff participate.  During the meeting in which Mr. Dowling and Associate Commissioner Benny Thottam of BTDS were also present, Plaintiff informed Ms. Brown of his outstanding inquiry for the names of personnel with similar duties and said that he had not received a response from BTDS. Although Plaintiff had not been previously instructed to do this, Plaintiff recommended that BTDS's proposed action be treated as a counteroffer to a job offer made by another agency.

25.     The FDNY has not subjected Ms. Brown and Ms. Hamblin to scrutiny for whatever delays were experienced in this matter, during the month of June 2019, when both Ms. Brown and Ms. Hamblin were aware of the BTDS request. Plaintiff was not aware of the matter.  Moreover, Ms. Hamblin was not subjected to scrutiny for failing to respond to the inquiries on Plaintiff's July, 2019 email, and for failing to notify Ms. Brown of any matters that she was handling which were outstanding, prior to her leave of absence.

**C.     Implicit Bias**

26.     Mr. Stephen Rush repeatedly denied requests by the Deputy Commissioner of Life Safety Systems and Communications and the Chief Information Officer for a salary increase for the Plaintiff, while manipulating job descriptions to justify salary increases for himself and his predominantly white male subordinates during the period relevant to this case. Benny Thottam informed the Plaintiff, to the effect that Steve Rush was on the way when he tried to get Plaintiff a salary increase. Mr. Thottam urged Plaintiff to agree to transfer to the Bureau of Technology Development and Systems as a lateral, and that he will try to get him an increase when Steve retires in 2020. Mr. Thottam repeated the remarks when he advised the Plaintiff on September 3rd and 4th, 2020 in separate phone calls regarding the reorganization of the Bureau of Technology Development and systems and Plaintiff's revised reporting relationship to Thomas Dowling, a Deputy Information Officer (CIO), instead of the CIO. Mr. Rush's actions demonstrated implicit bias.

## RETALIATION

27.     Since the Plaintiff's EEOC charge, he has suffered loss of functional title and staff; loss of responsibility commensurate with his knowledge, qualifications and skills, and has been generally

ignored. He is assigned tasks that do not provide any of the critical characteristics of work[8]: meaningfulness, responsibility and knowledge of outcome. Noteworthy is the low level of "Task Significance.[9]" The Plaintiff is under the impression that he is being constructively frustrated and pushed out of the agency.

28.     Prior to the reorganization of BTDS in September 2020, Plaintiff reported directly to the Chief Information Officer (CIO)/Associate Commissioner (BTDS Organization Charts). However, the Plaintiff has been reassigned to report directly to the Deputy CIO. Plaintiff's direct reporting relationship to the CIO was the agreement in the discussions with the Deputy Commissioner of Life Safety Systems and the CIO prior to transferring. The Plaintiff expressed his concerns, but they were ignored. The FDNY has continued to treat the Plaintiff differently from his peers in "Director" roles. By contrast, the CIO has been quick to accommodate requests for high-level titles for other personnel such as the office title designation of the Director of Security as Chief Security Officer, while such requests by the Plaintiff are ignored.

29.     The reassignment of the Plaintiff was implemented despite Plaintiff informing Mr. Thottam that Thomas Dowling had made false accusations that were used by Ms. Brown against him in her EEOC response.[10] The Plaintiff has explained the circumstances of this alleged delay in this case, showing that the allegations were false.

30.     Plaintiff asserts that because the FDNY raised criticism of his performance that was never before brought to his attention and contains false statements about him, the FDNY had engaged in retaliation and has continued to take adverse actions against the Plaintiff.

---

[8] *See* Hackman, J.R. and Oldham, G.R. (1976) *Motivation through the Design of Work: Test of a Theory. Organizational Behavior and Human Performance, 16, 250-279.*
[9] *Id.*
[10] Position Statement, at 11 &12, 22 & 23.

31.     FDNY made allegations against the Plaintiff regarding a purported failure to report EEO violation by Michael Fellner, an employee assigned to CID, against Ms. Margaret Quinn-Puppa, the then Director of CID. At no time was the Plaintiff informed that Ms. Quinn-Puppa was violating[11] the EEO policy or the Anti Bullying policy.  However, the FDNY insinuated that the Plaintiff knew such a violation had taken place and that he failed to report it. This was an attempt by the FDNY to implicate and intimidate the Plaintiff about misconduct after he had filed a Charge of Discrimination. This was also a case of hyper scrutiny and should be treated as retaliation. Notably, the Plaintiff was never previously told (until he filed a charge of discrimination) that there was an apparent allegation of failure to report against him. This is an evident example of making untruthful and uncorroborated allegations about the Plaintiff, which is an obvious act of retaliation.

## JURISDICTION

32.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. § 2000., 28 U.S.C. § 1331, 42 U.S.C. § 206, 42 U.S.C. §§ 12101, 29 U.S.C. §§2601, 42 U.S.C. § 1981, 42 U.S.C. § 1983.

33.     This Court may exercise supplemental jurisdiction over the Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367.

34.     The venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)(2), as Defendants are located in this district and the events giving rise to the Plaintiffs' claims occurred in this district.

## PLAINTIFF

35.     Plaintiff, David Ogula has served the FDNY for more than thirteen years and the City overall for more than twenty years.

---

[11] *Id.* at P 11

DEFENDANTS

36.     Defendant, City of New York ("City") is a municipality duly incorporated under the laws of the State of New York and maintains its principal place of business at 260 Broadway, New York, New York 10007. Defendant City has at all times relevant to this action been an employer within the definition of Title VII. Defendant City is a "person" for purposes of 42 U.S.C. § 1983. Defendant, City is authorized under the laws of the State of New York and City of New York to maintain a fire department, the Fire Department of New York ("FDNY"), which is a department, agency, bureau and/or subdivision of the City. FDNY is authorized under the laws of the State of New York and City of New York to maintain the bureaus of Human Resources and Technology Development and Systems. The Plaintiff is and at all times relevant to this action have been employed by the City/FDNY.

37.     Defendant, Fire Department of New York is an agency of the City which employs the City's Firefighters, Emergency Medical Technicians ("EMT"), Paramedics and employees serving in civilian and non-uniformed titles.  FDNY maintains its principal place of business at 9 Metro Tech Center, Brooklyn, NY 11201.

38.     Defendant Terry L. Brown is a Deputy Commissioner at FDNY.  Ms. Brown possesses far-reaching authority within the FDNY that includes nearly all FDNY attorneys, with a few exceptions. Ms. Brown's chain of command and oversight includes all legal matters involving the FDNY and Human Resources.  Ms. Brown is one of a select number of persons who report directly to Fire Commissioner Nigro. Because Fire Commissioner Nigro rose through the Fire uniformed ranks and is not an attorney, Fire Commissioner Nigro would understandably rely on Ms. Brown to obtain competent, complete and candid legal advice. As a result, Fire Commissioner Nigro

would, and should, reasonably hold Ms. Brown to the highest professional and ethical standards.

39.     Defendant, Stephen Rush is a Deputy Commissioner for Budget and Finance with an extensive reach in hiring and compensation decisions. Mr. Rush maintained oversight responsibility for Budget and Finance as Assistant Commissioner for about 32 years (1987 – 2019). He was promoted to Deputy Commissioner in May, 2019, pending his retirement. Fire Commissioner Nigro would also justifiably rely on Mr. Rush's advice and expertise in budget and finance. Throughout the period of Plaintiff's employment at FDNY, Mr. Rush has been involved in employee promotion and compensation actions. Mr. Rush's compensation decisions had discriminatory adverse impact on protected minority employees including the Plaintiff.

40.     Defendant, Daniel A. Nigro as "agency head" or "Fire Commissioner" supervises Ms. Brown. At all times relevant to this action, Daniel Nigro has served as Fire Commissioner/Agency Head[12] at FDNY.

PROCEDURAL BACKGROUND

41.     On September 12, 2019, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations by Terryl Brown and FDNY, Defendants herein, of federal, state, and local law, including but not limited to Title VII, the New York State Human Rights Law; the New York City Human Rights Law (NYC Administrative Code, §§8-107(1)(a) and (d), 8-107.13, and 8-107.1); the New York State Civil Service Law §55-a; the Citywide Equal Employment Opportunity Policy - Standards and Procedures utilized by City Agencies, and the equal employment opportunity requirements of the New York City Charter. The EEOC Charge and FDNY Position Statement are incorporated herein

---

[12] Pursuant to the City Charter, the agency head "shall exercise due diligence in ensuring their faithful execution, enforcement and performance. . ." "The heads of mayoral agencies shall supervise the execution and management of all programs and activities of their respective agencies and shall have cognizance and control of the government, administration, and discipline of their agencies (NYC Charter §385 & 387).

by reference.

42.     Plaintiff actively sought to communicate the discriminatory treatment he received to FDNY executive staff. Plaintiff discussed the matter with Elizabeth Cascio, the Fire Commissioner's Chief of Staff, the Chief of Department Sudnik, and with Mr. JonPaul Augier, Mr. Nguyen, and Mr. Benny Thottam. Plaintiff requested, via email, to speak with First Deputy Commissioner Laura Kavanagh about the manner in which Ms. Brown was treating him, but Plaintiff did not hear from Ms. Kavanagh. To the best of Plaintiff's knowledge, no actions were taken to investigate Ms. Brown, whether as an EEO violation, misconduct or mismanagement.

43.     On September 30 2020, the EEOC issued Plaintiff a Notice of Right to Sue (attached as Exhibit 1) to enable him to proceed with litigation. All conditions precedent to the initiation of this action have been fulfilled, and the instant Complaint is timely.

FACTUAL BACKGROUND

44.     David Ogula is an African American male with a master's degree in Public Administration and a Doctoral degree in Management and Organizational Leadership. Mr. Ogula commenced working at FDNY on May 27, 2007, as an Assistant to the then Assistant Commissioner (AC) for Human Resources, Donay Queenan. He initially served in the Civil Service title of Administrative Staff Analyst, non-managerial.  In February 2016, he was promoted to the position of Director of Civilian Learning and Development (and assumed the civil service title: Executive Program Specialist). This promotion was implemented to retain him at FDNY after he had been offered the position of Director of HR at the Department of Investigation ("DOI"). He currently holds the civil service title of Administrative Staff Analyst Non-Managerial, on a permanent basis.

As Director of Learning and Development, David Ogula was directly responsible for designing and implementing civilian development programs. Ms. Queenan maintained his role as her

assistant and he continued to assist in the day-to-day administration of the human resources bureau. Ms. Queenan delegated to David Ogula several management responsibilities including the Chair of the Performance Evaluations Review Board, which reviewed appeals of certain performance evaluations. He also represented HR during meetings of the Workplace Violence Prevention Committee, which reviews allegations of workplace violence. He was a confidential recorder and advisor to the Personnel Review Board, which reviews Firefighter candidates who may have had disqualifying information in their background, to determine whether they should be appointed by the FDNY. He also performed several special projects for the Assistant Commissioner of Human Resources; conducted job/salary analysis, contributed to the formulation and/or revision of standards, procedures, and policies, including the Civilian Resource Manual, CID Investigator Manual, and Personnel Review Board Guidelines, the Discretionary Action Guidelines, the FDNY draft Compensation policy, and the Learning Management System. In 2014, he received the Leon Lowenstein Award, for his work in promoting civilian employee development. In 2016, after he had become a manager, he was awarded an authorized leave day, for "Exemplary Managerial Performance."

## NO DISICIPLINARY HISTORY

45.     During Plaintiff's tenure with the Fire Department, he has never been subjected to either formal or informal discipline and received "outstanding" performance evaluations.

46.     The Plaintiff is a naturalized citizen of the United States of America, a black male born in Nigeria.[13] He is currently an FDNY employee.

---

[13] Plaintiff is in a protected class and asserts discrimination, implicit bias and disparate treatment under Title VII of the Civil Rights Act of 1964, New York State Human Rights Law, New York City Human Rights Law, and other related statutes.

47.     Ms. Brown was aware that Plaintiff is a male and that Plaintiff was foreign-born, and therefore, a member of four protected classes - race, age, gender, and national origin.

48.     Ms. Bridget Hamblin and Ms. Marie Giraud are FDNY female employees who are not foreign-born.

DISPARATE IMPACT

49.     The Black and Hispanic demographics in New York City (the "City") comprise a substantial portion of the City's population, but their representation in the New York City Fire Department ("FDNY") has remained extremely low. The July 2019 United States census estimate of the New York City population was 8,336,817. The US census figures identified 42.7% of the City's residents as white, 29.1% Hispanic, 24.4% black, 13.9% Asian, and 37% of its residents as foreign born. However, there continues to be overwhelming disparity between minority representation in the FDNY managerial positions in proportion to the staff population and the general population of New York City.

50.     The Department's racial and gender disparity are longstanding issues. While the nonuniformed or civilian workforce at the FDNY overall comprises of large male and non-white employees, the senior management positions at the FDNY have historically been dominated by white male employees. The unrepresentativeness of the Fire Department triggered a lawsuit in May of 2007. In 2014, the lawsuit was settled and the United States and Vulcan Society v. City of New York found the FDNY's hiring practices to be discriminatory.

51.     Though staff demographics shows that the minority members are increasing in the uniform services, the FDNY lags far behind other large City agencies in both gender and race. In 2015, the New York City Council passed Local Law 49 to require transparency from the FDNY regarding

gender and racial demographics. Though this law focused on the firefighter and EMS applicant pool, the City Council required reporting demographics of the FDNY in its entirety.[14]

## THE SENIOR AND MIDDLE MANAGEMENT STAFF HIRING PROCESS

52.    Appointments and promotions into positions in the New York City "classified" civil service is guided by the DCAS, Personnel Rules and Regulations and directives promulgated by DCAS such as the Personnel Service Bulletins. DCAS Personnel Service bulletin 200-9[15] states that agencies must determine if an eligible civil service list exists:

> If no eligible list exists and the agency decides to fill from within, the agency should post a Vacancy Notice within the agency for a period of ten (10) working days" after receiving prior authorization to fill the vacancy. The date for the posting should begin no later than three (3) working days after the vacancy notice is distributed to agencies.

53.    Applicants are required to submit an application via the City's electronic hiring system. Among other best practices, agencies are required to conduct panel structured interviews, to ensure fairness and reduce bias.

54.    FDNY posts senior positions with pre-selected candidates for less than the stipulated duration, circumventing the City's hiring protocols.

55.    The legal authority (the New York State Constitution) sets forth the principle for appointment into civil service positions: New York City and FDNY must take adequate measures to ensure that appointment to civil service positions be based on merit and fitness.[16] This applies

---

[14] THE COUNCIL OF THE CITY OF NEW YORK, *Report of the Finance Division on the Fiscal 2021 Preliminary Plan and the Fiscal 2020 Preliminary Mayor's Management Report for the Fire Department of New York,* March 3, 2020, P 6.  Available at, https://council.nyc.gov/budget/wp-content/uploads/sites/54/2020/02/057-FDNY.pdf
[15] DCAS Personnel Service bulletin 200-9, available at https://www1.nyc.gov/site/dcas/reports/personnel-services-bulletins.page (last visited December 9, 2020).
[16] NY Const, art V, § 6.

to discretionary positions which must also be based on the relevant knowledge, skills and abilities that will determine which applicants will best perform their specific public duties.

## A.    FDNY Senior Management Staff Representation

56.    FDNY has approximately 2,000 civilian personnel, of which an estimated 24 individuals hold senior managerial positions and approximately seventy (70) staff are in middle managerial positions. FDNY senior staff list shows that approximately 42% of the senior staff are white male, and approximately 33% are female. In all, 75% of senior managerial staff are white. Only 25% are non-white, of which there is no representation of black males (0%) in the senior management offices; there is zero (0%) female Hispanic and Asian representation; four (4%) Hispanic male, eight (8%) Asian male, and thirteen (13%) black female representation.

57.    Despite the City Council's directive and FDNY's Diversity and Equal Employment Opportunity policy,[17] under-representation among senior management staff remains.

58.    Black male applicants are disproportionately barred for middle and senior management positions or frequently dislodged,[18] resulting in chronic under representation within FDNY decision making positions.

---

[17] *See* FDNY EEO Policy 2016.
[18] FDNY appointments into senior management positions have a disparate impact and implicit bias against black male employees. For example, the failure to promote black male who served as deputies to Assistant or Associate Commissioner positions (Patrick Damas, Toma Acholonu, and the Plaintiff), and the constructive displacement of Dr. Tremaine Sayles. By contrast, several white employees were appointed through a truncated internal process into senior management positions (*Id.*)

## FACTUAL ALLEGATIONS

**A.     Development of a Position Exclusively for Ms. Hamblin**

59.    Ms. Hamblin had applied for the Assistant Commissioner/HR position about January 2019

and presumably was interested in the position. Ms. Brown apparently had other plans to

specifically further Ms. Hamblin's career.

In an email to Plaintiff, dated April 24, 2019, Ms. Brown inquired:

> Can you remind me of Bridget's civil service title and the salary range.[?]  Also please
> advise whether the title has levels and whether there is room, if necessary, for her to move
> up a level.

In an email, also dated April 24, 2019, Plaintiff responded as follows:

> Her CS [Civil Service] title is, Executive Agency Counsel M3.
> Managerial levels are from M1 – 8, DC[']s [Deputy Commissioners] are M7; M-levels
> serving [as] ACs [Assistant Commissioners] are from 3-5.

The M3 salary range is: Min: $69,940, Incumbent $75,425, Max, $186,555.

In another email also dated April 24, 2019, Ms. Brown wrote:

> If Assistant Commissioners are between 3-5, would it be fair that an Associate
> Commissioner be at 6?  What level was Maldonado [referring to Jose Maldonado, who at
> one time was an Associate Commissioner and was subsequently promoted to Deputy
> Commissioner]? Can you identify appropriate salaries for Associate Commissioners
> overseeing +100 employees and 4 unit (HR, CID, Enforcement & Drug Testing).

In another email also dated April 24, 2019, Plaintiff responded:

> Jose Maldonado was M4 as Associate Commissioner, Chief of Staff M4, Caroline Kretz [a
> former Associate Commissioner] M3.
>
> Initial thoughts: $165K - $175K.  This takes into account salaries of large Bureau AC's
> (Fleet and Facilities).  Some Agency Medical Directors [are] M6s earning lower than 170K.
> A more comprehensive review could be done.

The April 24, 2019 email exchange had one subject, which was originally generated by Ms. Brown:

> "Bridget Hamblin."

60.     Although Plaintiff sought to respond to Ms. Brown's email professionally, it was becoming clear that a special position was being created for Ms. Hamblin.

61.     On April 25, 2019, Ms. Brown visited Plaintiff's office and informed him that she wanted to create a position for Ms. Hamblin. Ms. Brown said that the position would oversee HR, CID, Enforcement and the Drug Testing Unit.

62.     Ms. Brown requested that Plaintiff draft, for her signature, a memorandum to the Fire Commissioner requesting the Fire Commissioner's approval. Because Plaintiff understood the position to be a high-level position, he suggested that a more comprehensive review be done regarding Ms. Brown's proposal for an Associate Commissioner position and recommended posting on the DCAS website. Ms. Brown did not respond to this suggestion.

63.     Ms. Brown never requested that Plaintiff prepare a Managerial Position Description, which would have addressed in detail the managerial role and appropriate assignment level for the managerial position. Plaintiff was not asked to prepare a Vacancy Request Form. Plaintiff was not told whether Ms. Brown had sought budgetary approval for a new position.

64.     Plaintiff prepared two draft documents, based solely on the description provided by Ms. Brown: (1) a draft memorandum to the Fire Commissioner containing the description that Ms. Brown gave Plaintiff; and (2) a draft Job Posting Notice. The draft documents were sent to Ms. Brown on April 25, 2019.

65.     In contrast to the planning and work that Ms. Brown was apparently undertaking to further Ms. Hamblin's career, in April 2019, Ms. Brown discussed Plaintiff's future role with HR but had not given him prior notice that she would be discussing this matter with Plaintiff.

66.     On the following day, Plaintiff took annual leave due to high emotional distress.

**B.     First Job Posting Notice for Associate Commissioner Position**

67.     On May 3, 2019, NYC DCAS promulgated the position of Associate Commissioner, Manager Level 5, (Job ID: 392910). The Minimum Qualification Requirements were:

> 1.     A bachelor's degree from an accredited college and 4 years of satisfactory experience of a nature to qualify for the duties and responsibilities of the position, at least 18 months of which must have been in an administrative, managerial, or executive capacity or supervising personnel performing activities related to the duties of the position; or
>
> 2.     A combination of education and/or experience equivalent to "1" above. However, all candidates must have the 18 months of administrative, managerial, executive, consultative or supervisory experience described in "1" above.

68.     Based on the Minimum Qualification Requirements, a law degree, admission to practice law, or legal experience were not requirements for the position.

The Preferred Skills for the Associate Commissioner position (*Id.* Job ID: 392910) were:

> Managerial experience and knowledge of civil service laws and rules, Human Resources Administration, Candidate Investigations, Criminal Law, and Drug Testing policies. Juris Doctor from an accredited law school and ten years of legal experience.

69.     The first Job Posting Notice for the Associate Commissioner position was promulgated to City employees only on the NYC DCAS website, on May 3, 2019.  The Job Posting Notice stated that it would be posted for *one day*, May 3, 2019.  By May 4, 2019, the Job Posting Notice was removed from the NYC DCAS website.

70.     The one-day posting period violated City personnel rules which required a posting period of at least ten days for positions announced internally to City employees; the posting period also violated the principle of transparency.

71.     As Plaintiff believed he was qualified for the position, he applied for the position of Associate Commissioner.  Plaintiff never heard from the FDNY in response to his application.

**C.     Second Job Posting Notice for Associate Commissioner Position**

72.     On May 17, 2019, NYC DCAS again promulgated the position of Associate Commissioner.  The Office Title for the position was changed to Associate Commissioner/Deputy Legal Counsel (Job ID: 393983). The Minimum Qualification Requirements were:

> 1.     A bachelor's degree from an accredited college and 4 years of satisfactory experience of a nature to qualify for the duties and responsibilities of the position, at least 18 months of which must have been in an administrative, managerial, or executive capacity or supervising personnel performing activities related to the duties of the position; or
>
> 2.     A combination of education and/or experience equivalent to "1" above. However, all candidates must have the 18 months of administrative, managerial, executive, consultative or supervisory experience described in "1" above.

73.     Based on the Minimum Qualification Requirements, a law degree, admission to practice law, and legal experience were not requirements for the position.

The Preferred Skills for the Associate Commissioner position (*Id.* Job ID: 393983) were:

> Managerial experience and knowledge of civil service laws and rules, Human Resources Administration, Candidate Investigations, Criminal Law, and Drug Testing policies.  Juris Doctor from an accredited law school and ten years of legal experience.

74.     The second Job Posting Notice stated that it would be posted until May 22, 2019 (approximately 5 days).

75.     Plaintiff did not apply in response to the second posting, because he had already submitted an application for the Associate Commissioner position, in response to the May 3, 2019 Job Posting Notice.  The FDNY has acknowledged that "the job description section in both the original and revised posting remained substantively unchanged" and acknowledges that he did apply for the Associate Commissioner position (Position Statement, page 8).

**D.     Manipulation of Minimum Qualification Requirements**

76.     The FDNY claims (Position Statement, page 8), that Plaintiff was not qualified for the Associate Commissioner/Deputy Legal Counsel position.

21

77.     The FDNY also claims that "Complainant is not an attorney and does not have a legal background and was therefore unqualified for this position" (Position Statement, Page 8).

78.     A law degree, admission to practice law in any state, or legal experience are not among the Minimum Qualification Requirements for the Associate Commissioner/Deputy Legal Counsel position. If a job qualification is mandatory it must be explicitly listed in the Minimum Qualification Requirements. The FDNY's inclusion of duties that are seemingly "legal," in the Job description and the FDNY's alteration of the position's office title to include "Deputy Legal Counsel" in the second posting does not change the Minimum Qualification Requirements for the position (*Supra* Minimum Qualification Requirements, Job ID: 393983).

79.     The FDNY manipulated the Minimum Qualification Requirements for the Associate Commissioner position to include requirements that are not explicitly contained therein, in apparent violation of City policy.  The FDNY cannot claim that the selected candidate must be an attorney with legal experience if these are not job requirements. Only minimum qualifications are.

80.     Having a Juris Doctor and ten years of legal experience is a preferred skill but not a mandatory requirement for the Associate Commissioner position.  Therefore, the FDNY is falsely stating that Plaintiff was unqualified because he was not an attorney.  This is both discrimination and retaliation. This is also another illustration of the FDNY's lack of transparency and its willingness to create a position solely for one person (*Supra* Preferred Skills, Job ID: 393983).

81.     The disqualification of Plaintiff because he did not have a preferred skill, is a further example of the FDNY's discriminatory treatment of Plaintiff. As already noted, Ms. Ayana Brooks was selected as Assistant Commissioner, HR even though she did not have a preferred skill. Ms. Giraud was appointed as Assistant Commissioner, CID even though she did not have a preferred skill.  It is obvious that Plaintiff was being subjected to disparate treatment.

82.     Ms. Brown did not follow civil service protocols in her appointments; she did not follow the civil service managerial allocation guidelines[19] in determining the managerial level of the Assistant Commissioner for CID position nor did she reevaluate the job of the revised Assistant Commissioner position she created. Ms. Brown also did not conduct a job analysis for the Associate Commissioner position. She was advised by HR staff of the need to conduct this assessment but ignored the advice.

83.     The FDNY also failed to conduct a job analysis stating whether the scope of responsibilities of the head of CID had expanded and whether an upgrade in title with a higher salary would be necessitated. The FDNY has failed to consider why someone in the Assistant Commissioner, HR position would no longer be competent to oversee Candidate Investigation Division operations.

84.     The responsibilities of the head of the Candidate Investigation Division did not change after Ms. Brown assumed oversight of the Bureau of Human Resources. The responsibilities of the Candidate Investigation Division (including procedures for conducting investigations and the screening of firefighters) have been closely overseen and approved by a Court Monitor appointed in the Vulcan Society case.  For the screening of Firefighter candidates, which constitutes most of the work of CID, the Candidate Investigation Division already had written protocols and related forms in place, and CID personnel have participated in training sessions administered by an outside consultant.

85.     According to FDNY the Candidate Investigation Division "processes [were] streamlined" and "task ownership [was] made clear" (Position Statement, page 7), but this alone would not necessitate that the unit head be an Assistant Commissioner. This would also not require the involvement of a supervisor (let alone a high-level supervisor).

---

[19] Managerial Allocation Guidelines.

**E.    The Vetting Process for Selecting the Assistant Commissioner, CID**

86.    Under Ms. Brown's oversight and approval, a vetting process was developed for the consideration of applicants to the Assistant Commissioner, CID position, in which applicants would be interviewed by a first panel, applicants would be selected by the first panel to advance for further consideration by a second panel, and the second panel would make a final selection.

87.    The first panel, which includes Ms. Hamblin, Ms. Corina Leske, and Plaintiff collectively determined that Ms. Giraud would not advance in the application process because she did not have an investigative background and experience.

88.    In selecting Ms. Giraud, Ms. Brown ignored Ms. Giraud's documented disciplinary history, Ms. Giraud's lack of extensive and proven managerial and legal experience, and disregarded a vetting process that was established under Ms. Brown's oversight. Ms. Brown has not given the Plaintiff the extraordinary preferential treatment that she has given to Ms. Giraud.

89.    The assignment of Ms. Hamblin and Ms. Giraud to the Bureau of Human Resources were unjustified because at the time these were unofficial appointments:

    (1)    Neither Ms. Hamblin nor Ms. Giraud possessed any extensive and proven managerial or HR experience.

    (2)    Both Ms. Hamblin and Ms. Giraud had performance issues in their work histories, and Ms. Brown disregarded these performance issues.

    (3)    Both Ms. Hamblin and Ms. Giraud were, apparently, interested in seeking an appointment in the Human Resources Bureau and assigned tasks related to their interest.

**F.    Ms. Giraud Performance as Unofficial Head of Candidate Investigation**

90.    Ms. Brown disregarded problems with Ms. Giraud's performance while Ms. Giraud was unofficially heading CID.  This disregard illustrates that the Plaintiff was subjected to disparate

treatment: any apparent errors on Plaintiff's part were placed under the microscope, while problems with Ms. Giraud's performance were not subject to the same scrutiny.

91.     Prior to Ms. Giraud's official appointment as Assistant Commissioner/CID in about April 2019, Ms. Brown requested that Ms. Giraud prepare Tasks and Standards for certain personnel assigned to CID.  The Tasks and Standards drafted by Ms. Giraud were given to Ms. Hamblin for review.  Ms. Hamblin sought Plaintiff's assistance, because, in Ms. Hamblin's opinion, the Tasks and Standards prepared by Ms. Giraud was substandard. Ms. Hamblin informed Plaintiff, to the effect, that the Tasks and Standards prepared by Ms. Giraud were unacceptable.  Among other problems, the Tasks and Standards forms prepared by Ms. Giraud did not properly distinguish between "Tasks" from "Standards."

92.     Ms. Giraud's performance demonstrated that she did not possess managerial skills. She made serious errors in preparing Tasks and Standards.

93.     Ms. Brown was aware that Ms. Giraud had not performed an essential duty of a supervisor competently.  Ms. Hamblin informed the Plaintiff that, Ms. Brown stated, to the effect, that Ms. Giraud "needed time to learn." Ms. Brown was prepared to appoint Ms. Giraud the Assistant Commissioner, CID position although Ms. Giraud was not fully competent to fulfill the position. Although Ms. Giraud was given preferential treatment, Plaintiff was not similarly treated.

94.     In addition to being discriminatory, Ms. Brown's conduct exhibits a lack of transparency. Ms. Brown's conduct also illustrates Ms. Brown's willingness to advance one person's career.

95.     The creation of the Associate Commissioner/Deputy Legal Counsel position, would be a new administrative rung within Ms. Brown's chain of command, that would duplicate existing functions (at a time when the City was under financial stress).

96.     For discretionary appointments into senior management positions, where no Civil Service

Examination exists, the City of New York has established guidelines for determining managerial positions, and filling managerial vacancies. These policy guidelines and processes are in place to help ensure that the hiring process is competitive and fair. Instead, the FDNY uses these policies as a pretext for preferential treatment for friends and conies, ignoring the under-representation and lack of racial and gender diversity amongst its senior staff. This cannot be justified as lawful exercise of executive decision-making authority, nor should it be dismissed as random or unrelated to discrimination, disparate treatment, and implicit bias based on race, gender, age or national origin.

97.     Plaintiff assert that the result of Defendants' actions, namely, their use of a subjective non-transparent promotional process that excluded a black male applicant that was foreign-born without following the City of New York policies for posting and hiring managerial employees[20] has resulted in disparate and discriminatory promotional practices. These practices have adversely affected the employment and promotional opportunities of the Plaintiff, despite having the requisite skills, training, and expertise.

98.     The FDNY has stated that there was "no business need" for a position that Plaintiff had proposed (Position Statement, page 12).  However, the FDNY failed to consider whether there was a legitimate business need to create the Associate Commissioner/Deputy Legal Counsel position, as its core duties are redundant.

99.     Based on years of experience of the Plaintiff regarding promotions, the plaintiff asserts that the current promotional process allows for too much discretion and subjectivity in promotional decisions. This process has permitted an environment in which overt or unconscious discrimination has flourished and resulted in black male candidates, female, and non-white employees being

---

[20] *Id.* Mayoral mem. on hiring senior staff and the constitutional mandate of merit and fitness in the public service for appointments into positions and promotions.

under-represented in senior management positions at FDNY. By allowing for so much discretion a supervisor could manipulate the process to promote whomever they wish, and/or by basing promotional decisions on solely subjective criteria and on the hiring manager's evaluations, without objective supporting metrics, which is the method currently employed.

100.    Further, Defendants often change the criteria for qualification without providing any justification for doing so. For example, the promotional process for promotion to Assistant Commissioner and Deputy Commissioner positions are manipulated to give preferential treatment to friends and cronies, which is evident in the interview process established for the selection and hiring of the Assistant Commissioner for CID. Ms. Brown hired an applicant (Ms. Giraud) who had not been recommended by the first panel of interviewers for further advancement in the application process.

101.    Any applicant for a senior promotion above supervisor is ostensibly evaluated on, among other things, their ability to satisfy the responsibilities of the position and the minimum qualifications of the position. However, the Plaintiff has observed the lack of annual performance evaluation for management employees. This lack of objective criteria to assess managerial performance allows for the use of impermissible and discriminatory considerations or biases.

102.    This noticeable absence of a fair and transparent hiring process to determine those best qualified for almost all senior management positions at FDNY has created a discriminatory environment, which adversely impacts not only female and non-white employees, but also other protected employees such as the Plaintiff and black male applicants overall.

103.    The heightened lack of a transparent promotional processes that allows explicit or implicit bias has been acknowledged and well-established as one basis by which an inference of pretext can be raised.

104.   Plaintiff alleges that allowing undue subjectivity in the promotional process is inappropriate for the Civil Service System and violates the City's rules and regulations, which were established for the express purpose of protecting against discrimination in promotions. Yet FDNY managers, including Ms. Brown, manipulate and sidestep the use of fair and transparent hiring protocols.

105.   The Equal Employment Practice Commission[21] ("EEPC") and Equal Employment Opportunity ("EEO") Office, has in the past substantiated employee complaints, but nothing or not enough has been done to respond to and/or correct these problems and they have been allowed to continue.

106.   This pattern underscores a long and chronic problem with discriminatory promotional practices, which Defendants are aware of, yet have not remedied.

107.   The City is aware of these concerns, and has even litigated these issues multiple times before, including but not limited to the cases of Goodman v. City of New York, Case No. 05-CV-06006 (JSR), in the U.S. District Court of the Southern District of New York and Monroe. v. City of the New York, Case No. 113822/2006.

108.   As a result of the foregoing, the Plaintiff has been subjected to a pattern and/or practice of discrimination in the terms, conditions, benefits and privileges of the Plaintiff's employment by the Respondents named herein, based upon his sex, gender, race, and national origin.

109.   Defendants' failure to utilize the very mechanisms it has established to ensure fairness in high-level promotions not only adversely impacts the plaintiff, but also raises questions regarding the entire promotional process to senior management positions and ultimately undermines and

---

[21] The Equal Employment Practice Commission (EEPC), November 10, 2015. Audit: Preliminary Determination: Review, Evaluation and Monitoring of the NYC Fire Department Employment Practices and Procedures from January 1, 2012 to December 31, 2014. _

devalues the critical work of outstanding civilian candidates.

110.    Plaintiff is a member of several protected classes. He is qualified for promotion to the position for which he applied and was denied opportunity for consideration in favor of lesser qualified female applicants because of their national origin, age, sex and/or gender. The FDNY's subjective promotional practices also allow for additional unlawful considerations including but not limited to race that influence promotional decisions.

111.    By the policies and practices described above, Defendants have deprived the Plaintiff of his statutory civil rights secured by Title VII and related statutes based on his race, national origin, age, sex, and/or gender in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, *et seq.*

112.    The acts, practices, and policies of the Defendants, as noted in this case, constitute ongoing discrimination against the Plaintiff in violation of the New York State Human Rights Law, New York Executive Law §§290, *et seq.*

113.    Defendants knew that their policies had either the intention or effect of unlawful discriminatory promotion selections between qualified male applicants and their less qualified female counterparts, and that this result constituted unlawful conduct on the basis of gender and national origin.

114.    Defendants' failure to redress these statutory violations and/or shows reckless disregard for the Plaintiffs' statutorily protected rights.

115.    As a direct result of the actions of the Defendants, Plaintiff has suffered injuries and damages and continue to suffer such injuries, including but not limited to loss of wages, salary, privileges, and responsibilities commensurate with his skills and ability.

## PLINTIFF'S PRIMA FACIE CASE

116.    Plaintiff has shown that the Defendants have engaged in discriminatory promotional practices and disparate treatment, which also shows implicit bias, gender disparity, and a glass ceiling for black male employees, such as the Plaintiff who is a black male and foreign born.

117.    The Plaintiff is suing to enforce the right of a black American male employee, to be treated fairly in the application process for senior management positions in the FDNY, regardless of his gender, national origin or age.[22]

## DEMAND FOR JURY

118.    Plaintiff demands trial by jury on all issues so triable.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(1)     Issue a permanent injunction enjoining Defendants from further violating Title VII, New York State Human Rights Law, New York City Human Rights Law, §1981, and § 1983, requiring Defendants to abolish their discriminatory internal promotional practices, and requiring Defendants to take such affirmative action as is necessary to ensure that the effects of their unlawful promotional practices are eliminated;

(2)     order Defendants to grant Plaintiff a retroactive promotional opportunity and compensation comparable to the promotional opportunities that have been granted to Ms. Giraud.

(3)     Direct Defendants to appoint an agreed upon independent monitor to review the City's

---

[22] In *United States v. City of New York; Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001)* (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). "To make this showing, a Plaintiff must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two." *Id.* at 160. *See also,* the statistical significance analysis performed by, Bernard R. Siskin, Ph.D., that establishes a prima facie case of disparate impact at FDNY. (USA Mem. 2.); the statistical significance analyses performed by, Joel P. Wiesen, Ph.D., all establish a prima facie case.

policies and practices and to initiate and enforce remedial steps to cure discriminatory promotional practices and to further investigate enforcement of any orders of this Court with regards to equitable and curative relief and to report on its findings;

(4)     order Defendants to complete an independent multi-disciplinary audit of the reorganization of the FDNY Bureau of Human Resources conducted under Ms. Brown's oversight, for compliance with City policies and industry practices and to determine whether discriminatory practices have been eliminated.

(5)     order Defendants to complete an independent audit of personnel actions taken under Ms. Brown's oversight, for compliance with EEO and other laws. Actions to be audited should include the creation of positions, job analyses, development of Managerial Position Descriptions, and Job Posting Notices, the review of written or electronic applications, the vetting, and selection of candidates.

(6)     Order the FDNY to develop written protocols for creating FDNY manager positions that are classified as non-competitive, and for posting (announcing), vetting and selecting candidates to fill manager positions that are classified as non-competitive.

(7)     Enjoin Ms. Brown from any supervisory oversight regarding this action nor the attorneys assigned to this case for transparency and to avoid a conflict of interest.

(8)     Award Plaintiff compensatory and punitive damages due to Defendants' willful and intentional acts directed at the Plaintiff;

(9)     Such other and further relief as this Court deems just and proper.[23]

---

[23] Upon assignment of attorney, award reasonable attorneys' fees, expenses and costs of this case.

Date:  December 21, 2020
New York, NY


David Ogula
(516)-812-7849
Ogul1@optonline.net
76 Ash Street
Valley Stream New York 11580

EXHIBIT   1

(Right to Sue)

EXHIBIT 1

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | David Ogula<br>76 Ash Street<br>Valley Stream, NY 11580 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2019-05506 | Perry Canales,<br>Supervisory Investigator | (929) 506-5318 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Perry A, Canales
Digitally signed by Perry A. Canales
DN: cn=Perry A. Canales, o=Equal Employment Opportunity
Commission, ou=New York District Office,
email=perry.canales@eeoc.gov, c=US
Date: 2020.09.30 19:02:13 -04'00'

For

9/30/2020

| Enclosures(s) | | *(Date Mailed)* |
|---|---|---|

Judy A. Keenan,
District Director

cc:   Carol L. Moran
Director
**NEW YORK CITY FIRE DEPARTMENT (NYFD)**
9 MetroTech Center, Fourth Floor
Brooklyn, NY 11201



K'S OFFICE

STATES DISTRICT COURT, EDNY

CADMAN PLAZA EAST

HN, NY 11201

PRO Se OFFICE

DAVID SCULA
76 ASH STREET
VALLEY STREAM
NY 11580

CLER

UNITED

225

BROOK

ATTN: