Case 1:20-cv-06346-EK-LB.  Filed 12/17/21 Page 1 of 36.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

RECEIVED
DEC 2 8 2021
PRO SE OFFICE

DAVID C. OGULA

**Amended Complaint**
**Pro Se Plaintiff**

-against-

**Case No. 1:20-cv-06346-EK-LB**
Jury Trial:    ☒X Yes    ☐ No

CITY OF NEW YORK, FIRE DEPARTMENT OF
NEW YORK (FDNY), TERRYL L. BROWN,
STEPHEN RUSH and DANIEL A. NIGRO

Plaintiff, on behalf of himself, complaining of the Defendants, allege the following:

## I    NATURE OF ACTION

1.    This is an action for relief from employment discrimination in violation of Title VII of

the Civil Rights Act of 1964, as amended ("Title VII"), Equal Pay Act of 1963 ("EPA"), Age

Discrimination in Employment Act of 1967 ("ADEA"), New York State Human Rights Law

("NYSHRL"), New York City Human Rights Law ("NYCHRL") and New York State Labor

Law.

2.    Plaintiff David C. Ogula allege that Defendants City of New York (hereinafter "City"),

Fire Department of New York (hereinafter "FDNY"), Terryl Brown, Stephen Rush (hereinafter

"Agents of Defendant"), and, Fire Commissioner (hereinafter "Daniel Nigro") collectively

"Defendants," unlawfully discriminated against him on the basis of his national origin, including

race, age, and sex, and harassed him on the basis of national origin and retaliated against him.

3.    Plaintiff further allege that Defendants' employment practices—all arising from internal

PRO SE OFFICE

employment policies and decisions (pre-selection of candidates, absence of objective selection criteria, posting of short job notices (less than the required 10 days), and manipulation of postings) implemented consistently at FDNY—had a disparate impact upon him based on his national origin, Nigerian.

4.      Plaintiff further allege that Defendants internal employment policies and practices violate New York State Human Rights Law (§ 296); New York State Constitution (NYS Const. Art V, § 6), New York City Charter (§ 812), the New York City Human Rights Law (§§ 8-107(1)(a) and (d), 8-107.13); the New York State Civil Service Law § 42.

5.      Plaintiff further allege that Defendants denied Plaintiff fair/equal compensation based on national origin, race, and gender/sex.

6.      Plaintiffs seek injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, and reasonable fees and costs as remedies for Defendants' violations of his rights.

## II        THE PARTIES

### PLAINTIFF

7.      Plaintiff, David Ogula, is a naturalized citizen of the United States of America, a black male born in Nigeria.   He served FDNY for more than thirteen years and has served the city overall for more than twenty-one (21) years. At all times relevant to this action Plaintiff was employed by FDNY.

8.      Defendant, City of New York ("City") is a municipality duly incorporated under the laws of the State of New York and maintains its principal place of business at 260 Broadway, New York, New York 10007. Defendant City has at all times relevant to this action been an employer within the definition of Title VII. Defendant City is a "person" for purposes of 42 U.S.C. § 1983. Defendant, City is authorized under the laws of the of New York and City of New York to maintain

a fire department, the Fire Department of New York ("FDNY"), which is a department, agency, and/or subdivision of the City. FDNY is authorized under the laws of the State of New York and the City of New York to maintain the bureaus of Human Resources ("HR") and Technology Development and Systems ("BTDS").

9.      Defendant, Fire Department of New York is an agency of the City which employs the City's Firefighters, Emergency Medical Technicians ("EMT"), Paramedics and other employees serving in civilian and non-uniformed positions. FDNY maintains its principal place of business at 9 Metro Tech Center, Brooklyn, NY 11201.

10.     Ms. Terry L. Brown is a Deputy Commissioner at FDNY.  Ms. Brown's chain of command and oversight includes supervision of all legal matters and human resources at FDNY. Because Fire Commissioner Nigro rose through the Fire uniformed ranks and is not an attorney, he would understandably rely on Ms. Brown to obtain competent, complete and candid legal advice. As a result, Fire Commissioner Nigro should have reasonably held Ms. Brown to the highest professional and ethical standards. Terry L. Brown is liable for individual civil penalty including punitive damages, pursuant to Title VII (§ 708), NYSHRL (§ 299), and NYCHRL (§ 8-124).

11.     Mr. Stephen Rush was a Deputy Commissioner for Budget and Finance. Mr. Rush had an extensive reach in employment and compensation decisions. Mr. Rush maintained oversight responsibility for budget, finance and compensation as Assistant Commissioner for about 32 years (1987 – 2019). He was promoted to Deputy Commissioner in May, 2019 prior to his retirement. Fire Commissioner Nigro would also justifiably rely on Mr. Rush's advice and expertise in budget and finance. Throughout the period of Plaintiff's employment at FDNY, Mr. Rush was involved in employment, promotion, and compensation decisions. Mr. Rush's compensation decisions had a discriminatory adverse impact on Plaintiff, a protected black male and Nigerian-born US citizen. Stephen Rush is liable for individual civil penalty including punitive damages, pursuant to

3

Title VII (§ 708), NYSHRL (§ 299), and NYCHRL (§ 8-124).

12.    Defendant, Daniel A. Nigro as "agency head" or "Fire Commissioner" supervises Ms. Brown.  At all times relevant to this action, Daniel Nigro served as Fire Commissioner/Agency Head[1] at FDNY. Mr. Nigro is liable for individual civil penalty including punitive damages, pursuant to Title VII (§ 708), NYSHRL (§ 299), and NYCHRL (§ 8-124).

### III JURISDICTION

13.    This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. § 2000., 28 U.S.C. § 1331, 42 U.S.C. § 206, 42 U.S.C. § 12101, 29 U.S.C. § 2601, 42 U.S.C. § 1981, 42 U.S.C. § 1983.

14.    This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

15.    The venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)(2), as Defendants are located in this district and the events giving rise to Plaintiffs' claims occurred in this district.

### IV PROCEDURAL BACKGROUND

16.    On September 12, 2019, Plaintiff filed a timely Charge of Discrimination with the EEOC, alleging violations by Terryl Brown and FDNY, Defendants herein, of his rights under Title VII, New York State Human Rights Law, § 296-c, New York City Human Rights Law / Administrative Code, §§ 8-107(1)(a) and (d), 8-107.13, New York City Charter, § 812 and New York State Civil Service Law § 42. The EEOC Charge and FDNY Position Statement are incorporated herein by reference.

17.    Plaintiff actively sought to communicate the discriminatory treatment he received to

---

[1] Pursuant to the City Charter, the agency head "shall exercise due diligence in ensuring their faithful execution, enforcement and performance. . ." "The heads of mayoral agencies shall supervise the execution and management of all programs and activities of their respective agencies and shall have cognizance and control of the government, administration, and discipline of their agencies (NYC Charter § 385 & 387).

FDNY executive staff: Elizabeth Cascio, Fire Commissioner's Chief of Staff, Chief of Department, Mr. Sudnik, Mr. JonPaul Augier, Mr. Nguyen, and Mr. Benny Thottam. Plaintiff requested, via email, to speak with First Deputy Commissioner Laura Kavanagh about the manner in which Ms. Brown treated him, but Plaintiff did not hear from Ms. Kavanagh. To the best of Plaintiff's knowledge, no actions were taken to investigate Ms. Brown, whether as an EEO violation, misconduct or mismanagement.

18.     On September 30, 2020, the EEOC issued Plaintiff a Notice of Right to Sue (attached as Exhibit A) to enable him to proceed with litigation. All conditions precedent to the initiation of this action have been fulfilled, and the instant Complaint was timely.

## V  FACTUAL BACKGROUND

19.     Plaintiff, is an African American male with a master's degree in Public Administration and a Doctoral degree in Management and Organizational Leadership.

20.     Plaintiff commenced working at FDNY on May 27, 2007, as an Assistant to the then Assistant Commissioner ("AC") for Human Resources, Donay Queenan. He initially served in the Civil Service title of Administrative Staff Analyst, non-managerial provisionally. In February 2016, he was promoted to the position of Director of Civilian Learning and Development / Executive Program Specialist. Plaintiff retained extensive responsibilities as Assistant to the AC for HR. This promotion was implemented to retain him at FDNY after he had been offered the position of Director of HR at the Department of Investigation. He currently holds the civil service title of Administrative Staff Analyst, on a permanent basis.

## VI  FACTUAL ALLEGATIONS

21.     On May 3, 2019, Plaintiff applied for the position of Associate Commissioner, Manager Level 5, (Job ID: 392910), but he was denied the opportunity for consideration and falsely deemed unqualified for lack of a preferred skill. Plaintiff was not considered for interview, nor

informed why he was not considered.

22.     On September 4, 2019, Ms. Brown gave Plaintiff an ultimatum to leave the bureau of HR or face demotion.

23.     Defendants' treated Ms. Hamblin and Ms. Giraud more favorably on the basis of their sex/gender and national origin. The HR bureau in which Plaintiff worked, was predominantly managed by female employees after he was forced out. Plaintiff was the only senior black male employee in the Bureau of HR and he is a member of several protected classes: race, gender/sex, age, and national origin.

24.     Defendant's pre-selected Ms. Brown and Ms. Giraud to managerial positions in HR. The Defendants' employment decisions and the practice of pre-selecting US-born female applicants to high level managerial positions, instead of a fair and transparent selection process, disparately treated and/or impacted Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, et seq., 42 U.S.C. § 1981, 29 U.S. § 623 ("ADEA"), New York State Human Rights Law ("NYSHRL," § 296-c), New York City Human Rights Law ("NYCHRL" / Administrative Code, §§8-101, 102, 8-107(1)(a) and (d), 8-107.13), et seq.

25.     Defendants gave Ms. Hamblin preferential treatment by having a position specifically created for her, but denied creating a position for Plaintiff. Ms. Brown's emails and verbal communications with Plaintiff made it clear that a position was being created specifically for Ms. Hamblin. Plaintiff was not similarly treated.

26.     Ms. Brown gave Ms. Giraud preferential treatment by appointing her to the Assistant Commissioner CID position even though she was not recommended to advance in the selection process.

27.     Ms. Hamblin and Ms. Giraud were selected for senior managerial positions in the Bureau of Human Resources despite their lack of human resources experience and significantly less

6

qualifications than Plaintiff for the HR positions.

28.    Ms. Hamblin, Ms. Giraud and Plaintiff were similarly situated because they were supervised by Ms. Brown and were seeking senior management positions at FDNY.

29.    Ms. Brown selected only female and US-born applicants - Ms. Giraud, Assistant Commissioner, Candidate Investigation Division ("CID"), Ms. Hamblin, Associate Commissioner, and Ms. Ayana Brooks as Assistant Commissioner for HR. Ms. Giraud and Ms. Brooks were selected for positions to which they applied even though they did not have a preferred skill.

30.    Beginning on or about February 2019, Ms. Brown subjected Plaintiff to multiple occasions of harassment and ridicule during which Ms. Brown sarcastically minimized his role as a precursor to forcing him out of HR.

31.    During a meeting, on or about April 2019, Ms. Brown dismissed Plaintiff's aspiration for a senior management position, stating that, "before you become the Deputy Commissioner, let us know what you can do for HR." This was stunning because Plaintiff had never informed Ms. Brown that he was seeking a Deputy Commissioner position.

**A.    National Stereotyping**

32.    On more than one occasion, Ms. Brown made derogatory comments based on national origin, including offensive cultural and/or national stereotypes to ridicule Plaintiff and minimize him, among other forms of discrimination, and barred him from consideration for an Associate Commissioner position.

33.    Ms. Brown characterized Plaintiff's desire for a senior management position verbally and in writing, as seeking to "inherit" or be "anointed." These cultural and/or national stereotypes and epithets were offensive to Plaintiff because they have been widely used in connection with certain illegal acts about Africans, and Nigerians in particular. They are drawn from a long-running scam

7

by criminals who claim to be Nigerian royalty asking the would-be victim to assist the supposed prince with transferring vast sums of money that are part of the prince's "inheritance."

34.     Terryl Brown characterized Plaintiff's experience and qualifications verbally and in writing, as "[complainant's] grandiose view that his experience and longevity in a subordinate position "entitles" him to lead FDNY's Bureau of Human Resources, regardless of civil service law and notwithstanding FDNY leadership's assessment of his performance.[2]

35.     The aspirations for senior management positions by Bridget Hamblin and Marie Giraud were never characterized with such derogatory language. Defendants attempted to criticize Plaintiff's performance, but disregarded the performance issues raised by the New York City Department of Investigations ("DOI") of Ms. Hamblin and Ms. Giraud and accorded them preferential treatment.

36.     To further minimize Plaintiff's seniority, Ms. Brown compared him, a manager, with Tunji Adewunmi, a Principal Administrative Associate/non-supervisor, apparently to group them in the same category. Ms. Brown was aware they were Nigerian-born employees (Position Statement P 10).

37.     Ms. Brown was aware of Plaintiff's race, gender/sex and national origin/foreign-born status, and therefore, a member of several protected classes, when she used the offensive cultural and/or national stereotypes.

**B.     Hostile Work Environment**

38.     Under Ms. Brown's oversight, Plaintiff faced a highly stressful work environment. Ms. Brown's actions displayed a lack of respect for the Plaintiff's qualifications, expertise, contributions, and status as a manager. Plaintiff discovered after Ms. Brown assumed oversight

---

[2] Defendants have neither provided Plaintiff "leadership's assessment of his performance" nor discuss his performance prior to this case.

8

of HR, that she was directing assignments and inquiries to Galina Mekhova and Janelle Bennett, in the Plan Action Request ("PAR") unit of HR. Ms. Mekhova and Ms. Bennett subsequently sought Plaintiff's guidance regarding the proper handling of Ms. Brown's inquiries or assignments. Ms. Brown could have referred these matters directly to Plaintiff, based on his prior communications with her.

39.     On or about June 25, 2019, Ms. Brown instructed Ms. Janelle Bennett to give an assignment to Plaintiff. Plaintiff oversaw Ms. Bennett's work. He had furnished Ms. Brown with his responsibilities on multiple occasions, including his overall responsibilities on behalf of Donay Queenan (the former Assistant Commissioner for HR), and during an attorney panel that she had convened. Ms. Brown showed no interest during the panel meeting and left the meeting prematurely.

**C.     Subjection to Heightened Scrutiny**

40.     Defendant's subjected Plaintiff to heightened scrutiny under Ms. Brown's oversight. Unknown to Plaintiff, on May 31, 2019, Mr. Thomas Dowling of the Bureau of Technology Development and Systems ("BTDS") had written an email to Ms. Hamblin, seeking approval to appoint Mr. Jack Fitzgerald, an employee in BTDS, into the title of Computer Specialist.

41.     Over one month later, on July 1, 2019, Ms. Hamblin forwarded Mr. Dowling's request to Plaintiff for review, in which she requested that Plaintiff compare the tasks of the proposed position to employees with similar levels of responsibility. Plaintiff wrote an email to Mr. Dowling in which he requested the names of BTDS employees with similar levels of responsibility.

42.     Plaintiff followed up with a visit to Mr. Dowling's Office and he was informed by Mr. Dowling that an email was sent to Ms. Brown on June 6, 2019 with updated information about the potential appointment of Mr. Fitzgerald. Neither Ms. Brown nor Ms. Hamblin had

9

forwarded the June 6, 2019 email to Plaintiff. Though Plaintiff obtained the email with the updated information from Mr. Dowling, he never received the names of BTDS employees with similar levels of responsibility that he had requested.

43.    At about this time, Ms. Hamblin went on maternity leave without responding to Plaintiff's email. It should be reasonably presumed that Ms. Hamblin had an obligation to notify Ms. Brown of any outstanding matters prior to her leave of absence.

44.    On August 22, 2019, when Mr. Dowling requested a status report from Ms. Brown, she scheduled a meeting on the same date and requested that Plaintiff participate. During the meeting in which Mr. Dowling and Mr. Benny Thottam of BTDS were also present, Plaintiff informed Ms. Brown when he received the request and his outstanding inquiry for the names of personnel with similar duties and said that he had not received a response from BTDS. During the meeting, Plaintiff recommended that BTDS's proposed action be treated as a counteroffer to a job offer made by another agency.

45.    FDNY did not subject Ms. Brown and Ms. Hamblin to scrutiny for whatever delays were experienced in this matter, during the month of June 2019, when both Ms. Brown and Ms. Hamblin were aware of the BTDS request. Plaintiff was not aware of the matter. Moreover, Ms. Hamblin was not subjected to scrutiny for failing to respond to the inquiries on Plaintiff's July, 2019 email, and for failing to notify Ms. Brown of any matters that she was handling which were outstanding, prior to her leave of absence.

46.    Plaintiff complained to the Chief of Staff and the Chief of Department about Ms. Brown's comments and treatment of him. Plaintiff's complaints were ignored.

47.    Ms. Brown, discussed a potential reassignment of duties pertaining to Justin Richards, an HR employee under Plaintiff's supervision at the time, without notifying Plaintiff. This was another example of Ms. Brown undermining Plaintiff. Plaintiff's responsibilities were

10

reassigned to Mr. Justin Richards, a US-born citizen.

**D.     Impact of Ms. Brown's Comments and Treatment on Plaintiff**

48.    Ms. Brown's comments and mistreatment of Plaintiff caused him to take leave on May 1, 2019, due to high emotional distress. During this leave, Plaintiff discussed with Mr. Nguyen, the Assistant Commissioner for EEO, Ms. Brown's discriminatory treatment of him, how she ridiculed and undermined Plaintiff. Plaintiff indicated that similarly situated non-black employees have never been treated in the manner in which he was treated. Plaintiff also sought professional help due to his emotional state.

49.    Ms. Brown was aware of Plaintiff's race, gender/sex, and national origin/foreign-born status, and therefore, a member of several protected classes, when she used the offensive cultural and/or national stereotypes.

50.    Plaintiff is informed and believe that Ms. Brown's comments against him were used only in the derogatory context of Plaintiff's gender/sex and national origin.

**E.     Sex Inferences/Discrimination**

51.    Plaintiff is informed and believe that Ms. Brown discriminated against him on the basis of his gender/sex.

52.    Ms. Brown used sexist language when she assigned tasks to Plaintiff. She made selective gender and subservient inferences such as "Take the laboring oar" in an official correspondence regarding the posting for the Deputy Commissioner for External Affairs and Public Information position. Ms. Brown also used male stereotypes, characterizing Plaintiff's straightforward expression for a senor managerial position as "grandiose." This term is often used against a black man excelling in a professional area mostly reserved for white males, and infer racism and sexism. Ms. Hamblin and Ms. Giraud's aspirations were never characterized with such derogatory language.

11

**F.    Age Discrimination**

53.    Plaintiff is informed and believe that Ms. Brown discriminated against him on the basis of his age.

54.    During meetings with Plaintiff, Ms. Brown discussed putting new blood into HR, using coded expressions such as "when you have been in a place for so long, you cannot see things differently, we need new blood" without stating what specifically needed to be addressed. Ms. Brown followed through, taking extraordinary steps to select and appoint younger candidates into HR positions. At the time, Marie Giraud, was about 37 years old, Bridget Hamblin, 40 years old, and Ayana Brooks, also about 40 years old. Plaintiff was about 60 years old.

55.    Ms. Hamblin and Ms. Giraud were selected for senior managerial positions in the Bureau of Human Resources despite their lack of human resources experience and qualifications.

56.    Ms. Brown clearly demonstrated a preference for younger female applicants.
Ms. Brown's employment decisions including her selection of candidates that were 40 years and younger, and her ultimatum for Plaintiff to leave the FDNY bureau of HR, were discriminatory and had an adverse impact on him.

57.    Ms. Brown was aware that Plaintiff is a member of several protected classes including race, age, gender/sex, and national origin.

**G.    Development of a Position Exclusively for Ms. Hamblin**

58.    Ms. Hamblin had applied for the Assistant Commissioner/HR position about January 2019 and presumably was interested in the position. However, there was a delay in filling this position and Ms. Brown apparently had other plans to specifically further Ms. Hamblin's career.  In an email to Plaintiff, dated April 24, 2019, Ms. Brown inquired:

> Can you remind me of Bridget's civil service title and the salary range. [?] Also please advise whether the title has levels and whether there is room, if necessary, for her to move up a level.

12

In an email also dated April 24, 2019, Plaintiff responded as follows:

> Her CS [Civil Service] title is, Executive Agency Counsel M3.
> Managerial levels are from M1 – 8, DC[']s [Deputy Commissioners] are M7; M-levels serving [as] ACs [Assistant Commissioners] are from 3-5.

The M3 salary range is: Min: $69,940, Incumbent $75,425, Max, $186,555.

In another email also dated April 24, 2019, Ms. Brown wrote:

> If Assistant Commissioners are between 3-5, would it be fair that an Associate Commissioner be at 6? What level was Maldonado [referring to Jose Maldonado, who at one time was an Associate Commissioner and was subsequently promoted to Deputy Commissioner]? Can you identify appropriate salaries for Associate Commissioners overseeing +100 employees and 4 unit (HR, CID, Enforcement & Drug Testing).

Plaintiff responded in another email also dated April 24, 2019:

> Jose Maldonado was M4 as Associate Commissioner, Chief of Staff M4, Caroline Kretz [a former Associate Commissioner] M3.
>
> Initial thoughts: $165K - $175K. This takes into account salaries of large Bureau ACs (Fleet and Facilities). Some Agency Medical Directors [are] M6s earning lower than 170K. A more comprehensive review could be done.

The April 24, 2019 email exchange had one subject, which was originally generated by Ms. Brown: "Bridget Hamblin." This made it clear that a position was being created specifically for Ms. Hamblin.

59.     In addition, Ms. Brown visited Plaintiff's office on April 25, 2019 and informed him that she wanted to create a position for Ms. Hamblin. Ms. Brown said that the position would oversee HR, CID, Enforcement and the Drug Testing Unit.

60.     Ms. Brown requested that Plaintiff draft, for her signature, a memorandum to the Fire Commissioner for his approval. Because Plaintiff understood the policy guiding high-level positions, he suggested that a more comprehensive review be done regarding Ms. Brown's proposal for an Associate Commissioner position and recommended posting the position. Ms. Brown did not respond to his suggestion.

61.     Specifically, Ms. Brown never requested that Plaintiff prepare a Managerial Position

Description ("MPD"), which would have addressed in detail the managerial role and appropriate

assignment level for the position. Plaintiff was not asked to prepare a Vacancy Request Form

("VRF") nor informed that Ms. Brown had sought budgetary approval for a new position.

62.     Plaintiff prepared two draft documents, based on the description provided by Ms. Brown:

(1) a draft memorandum to the Fire Commissioner containing the description that Ms. Brown gave

Plaintiff; and (2) a draft Job Posting Notice. The draft documents were sent to Ms. Brown on April

25, 2019.

63.     In contrast to the planning and work that Ms. Brown undertook to further Ms. Hamblin's

career, in April 2019, Ms. Brown discussed Plaintiff's future role with HR but had not given him

prior notice that she would be discussing this matter with Plaintiff – a matter that was of great

importance to him.

**H.      First Job Posting Notice for Associate Commissioner Position**

64.     On May 3, 2019, NYC DCAS promulgated the position of Associate Commissioner,

Manager Level 5, (Job ID: 392910) with the following Minimum Qualification Requirements:

> 1.      A bachelor's degree from an accredited college and 4 years of satisfactory
> experience of a nature to qualify for the duties and responsibilities of the position, at least
> 18 months of which must have been in an administrative, managerial, or executive capacity
> or supervising personnel performing activities related to the duties of the position; or
>
> 2.      A combination of education and/or experience equivalent to "1" above. However,
> all candidates must have the 18 months of administrative, managerial, executive,
> consultative or supervisory experience described in "1" above.

> The Preferred Skills for the Associate Commissioner position (*Id.* Job ID: 392910) were:

> Managerial experience and knowledge of civil service laws and rules, Human Resources
> Administration, Candidate Investigations, Criminal Law, and Drug Testing policies. Juris
> Doctor from an accredited law school and ten years of legal experience.

65.     The first Job Posting Notice for the Associate Commissioner position promulgated to City

employees, on May 3, 2019, noted that it would be posted for *one day*, May 3, 2019. This Job

Posting Notice was removed from the NYC DCAS website on May 4, 2019. The one-day posting period violated City personnel rules which required a minimum of ten (10) days.

66.    As Plaintiff believed he was qualified, he applied for the Associate Commissioner position on May 3, 2019. Plaintiff never heard from FDNY in response to his application.

**I.    Second Job Posting Notice for Associate Commissioner Position**

67.    On May 17, 2019, NYC DCAS promulgated a modified version of the Associate Commissioner position.   The Office Title for the position was changed to Associate Commissioner/Deputy Legal Counsel (Job ID: 393983), with the following Minimum Qualification Requirements:

> 1.    A bachelor's degree from an accredited college and 4 years of satisfactory experience of a nature to qualify for the duties and responsibilities of the position, at least 18 months of which must have been in an administrative, managerial, or executive capacity or supervising personnel performing activities related to the duties of the position; or
>
> 2.    A combination of education and/or experience equivalent to "1" above. However, all candidates must have the 18 months of administrative, managerial, executive, consultative or supervisory experience described in "1" above.

The Preferred Skills for the Associate Commissioner position (*Id.* Job ID: 393983) were:

> Managerial experience and knowledge of civil service laws and rules, Human Resources Administration, Candidate Investigations, Criminal Law, and Drug Testing policies.  Juris Doctor from an accredited law school and ten years of legal experience.

68.    The second Job Posting Notice was posted until May 22, 2019 for approximately 5 days.

69.    A law degree, admission to practice law, or legal experience were not required for the position in either posting.

70.    Plaintiff submitted an application for the Associate Commissioner position, in response to the May 3, 2019 posting (Job ID: 393983).  FDNY practice was to merge applicants, when a posting was modified. To exclude Plaintiff, FDNY did not merge applicants for the Associate Commissioner posting. FDNY acknowledged that "the job description section in both the original

and revised postings remained substantively unchanged" and also acknowledged that Plaintiff did apply for the Associate Commissioner position (Position Statement, P 8).

71.    Ms. Brown's pre-selection of Ms. Hamblin and desire to give her a pay increase to further Bridget Hamblin's career was in stark contrast to her marginalization of Plaintiff. Ms. Brown denied the tasks that Plaintiff proposed, but failed to consider whether there was a legitimate business need to create the Associate Commissioner position for Ms. Hamblin.

72.    Ms. Brown's conduct and decisions had a discriminatory impact on qualified black male incumbents, including Plaintiff.

73.    The creation of the Associate Commissioner position, was a new administrative rung within Ms. Brown's chain of command, that duplicated existing functions at a time when the City was under financial stress.

**J.    Manipulation of Minimum Qualification Requirements**

74.    FDNY disqualified Plaintiff for the Associate Commissioner position, claiming that "Complainant is not an attorney and does not have a legal background and was therefore unqualified for this position" (Position Statement, P 8).  Notably, a law degree, admission to practice law in any state, or legal experience are not among the Minimum Qualification Requirements for the Associate Commissioner position. If a job qualification is mandatory, it would have been explicitly listed in the Minimum Qualification Requirements.

75.    FDNY's addition of a few duties that were seemingly "legal," in the Job description and alteration of the position's office title to include "Deputy Legal Counsel" in the second posting did not change the Minimum Qualification Requirements for the position (*Supra* Minimum Qualification Requirements, Job ID: 393983).

76.    Possession of a Juris Doctor and ten years of legal experience were listed under preferred skills but not a mandatory requirement for the Associate Commissioner position. Therefore, FDNY

16

unjustifiably disqualified Plaintiff in violation of the minimum qualification requirements under NYS Civil Service law.

77.     The disqualification of Plaintiff because he did not have a preferred skill was discriminatory treatment of Plaintiff and a violation of his Title VII rights. Defendants selected, Ms. Ayana Brooks as Assistant Commissioner and Ms. Giraud was appointed as Assistant Commissioner, CID even though they did not have the preferred skills. This was obvious disparate treatment of Plaintiff.

78.     Ms. Brown did not follow the civil service managerial allocation guidelines in determining the managerial level of the Assistant Commissioner for CID position nor did she reevaluate the job of the revised Assistant Commissioner position she created. Ms. Brown also did not conduct a job analysis for the Associate Commissioner position. She was advised by HR staff of the necessity of this assessment but ignored the advice.

79.     Defendants failed to conduct a job analysis to determine whether the scope of responsibilities of the head of CID had expanded and whether an upgrade in title with a higher salary was justified. Defendants also failed to consider why someone in the Assistant Commissioner, HR position was no longer competent to oversee CID operations.

80.     The responsibilities of the head of the Candidate Investigation Division did not change after Ms. Brown assumed oversight of HR. The responsibilities of the Candidate Investigation Division (including procedures for conducting investigations and screening of firefighters) were closely overseen and approved by a Court Monitor appointed in the Vulcan Society case.

K.     **The Vetting Process for Selecting the Assistant Commissioner, CID**

81.     Under Ms. Brown's oversight and approval, a vetting process was established for the consideration of applicants for the Assistant Commissioner, CID position, in which applicants would be interviewed and selected by the first panel to advance for further consideration by a

second panel, and the second panel would make the final selection.

82.    The first panel, which included Ms. Hamblin, Ms. Corina Leske, and Plaintiff collectively determined that Ms. Giraud would not advance in the application process because she did not have an investigative background and experience.

83.    In selecting Ms. Giraud, Ms. Brown disregarded the vetting process and the New York State constitutional requirement of "fitness and merit" (NYS Const. art V, §6). Ms. Brown did not give Plaintiff such preferential treatment.

84.    Ms. Brown disregarded problems with Ms. Giraud's performance while Ms. Giraud was unofficially heading CID. This disregard illustrated that Plaintiff was subjected to disparate treatment: any apparent errors on Plaintiff's part were placed under a microscope, while problems with Ms. Giraud's performance were not subject to the same scrutiny.

85.    The appointment of Marie Giraud is evidence that the FDNY employment decisions were not based on merit, and showed preference for a younger female employee who had no HR experience nor qualifications.

**L.    Disparate Treatment /Implicit Bias Against Plaintiff**

86.    The Department's racial and gender disparity are longstanding issues. The unrepresentativeness of the Fire Department workforce triggered a lawsuit in May of 2007. In 2014, the lawsuit was settled and the US Eastern District Court of New York, in Vulcan Society v. City of New York, found FDNY's employment practices to be discriminatory.

87.    Plaintiff is informed and believe and thereon allege that the discriminatory practices found by US Eastern District Court of New York are still evident at FDNY.

**M.    The Imbalance in FDNY Senior Management Staff Representation**

88.    As of 2020, FDNY had approximately 2,000 civilian personnel, of which an estimated 24 individuals held senior managerial positions and approximately seventy (70) staff were in middle

18

managerial positions. FDNY senior staff list showed that approximately 42% of the senior staff

were white male, and approximately 33% were female. In all, 75% of senior managerial staff

were white. Only 25% were non-white, of which there was no representation of black males

(0%) in senior management positions; there was zero (0%) female Hispanic and Asian

representation; four (4%) Hispanic male, eight (8%) Asian male, and thirteen (13%) black

female representation.

89.     In 2015, the New York City Council passed Local Law 49 to require transparency at FDNY

regarding gender and racial demographics. Though this law focused on the Firefighter and EMS

applicant pool, the City Council required reporting demographics of FDNY in its entirety.[3]

90.     Despite the City Council's directive and FDNY's Diversity and Equal Employment

Opportunity policies,[4] under-representation among senior management staff remained.

91.     The statistics cited above, shows substantial demographic imbalance in FDNY senior

management. The data shows that there were no black male employees in senior management

positions at FDNY. Black male applicants were disproportionately barred for middle and senior

management positions or frequently dislodged,[5] resulting in chronic under representation within

FDNY senior management positions.

92.     Defendants' denial of opportunity for Plaintiff's advancement to a senior management

position is a willful act that perpetuated black male underrepresentation.

93.     Plaintiff is informed and believe that Mr. Stephen Rush repeatedly denied requests

---

[3] THE COUNCIL OF THE CITY OF NEW YORK, *Report of the Finance Division on the Fiscal 2021 Preliminary Plan and the Fiscal 2020 Preliminary Mayor's Management Report for the Fire Department of New York*, March 3, 2020, P 6.  Available at, https://council.nyc.gov/budget/wp-content/uploads/sites/54/2020/02/057-FDNY.pdf
[4] *See* FDNY EEO Policy 2016.
[5] FDNY appointments into senior management positions have a disparate impact and implicit bias against black male employees. For example, the failure to promote black male who served as deputies to Assistant or Associate Commissioner positions (Patrick Damas, Toma Acholonu, and the Plaintiff), and the constructive displacement of Dr. Tremaine Sayles. By contrast, several white employees were appointed through a truncated internal process into senior management positions (*Id.*)

by the Deputy Commissioner of Life Safety Systems and Communications and the Chief Information Officer for a salary increase for Plaintiff, while he manipulated job descriptions to justify salary increases for himself and his predominantly white male subordinates during the period relevant to this case. Benny Thottam informed Plaintiff, to the effect that Steve Rush was on the way when he tried to get Plaintiff a salary increase. Mr. Thottam urged Plaintiff to transfer to the Bureau of Technology Development and Systems without a pay increase, and that he will try to get him a salary increase when Mr. Rush retires in 2020. Mr. Thottam repeated the remarks when he advised Plaintiff on September 3rd and 4th, 2020 in separate phone calls regarding the reorganization of the BTDS and Plaintiff's revised reporting relationship to Thomas Dowling, a Deputy Information Officer (CIO), instead of the CIO. Mr. Rush's actions demonstrated obvious and/or implicit bias.

94.     Defendants and their agents denied Plaintiff an opportunity for career advancement and subjected him to disparate treatment, by unjustifiably claiming that Plaintiff was unqualified for consideration for the Associate Commissioner position.

95.     Defendant's use of subjective internal employment/promotional practices that lacked objective selection criteria, pre-selected candidates, posted notices for less than the minimum required 10 days, and manipulated postings, disparately treated and impacted Plaintiff, a black male foreign-born applicant, who sought promotion to a senior management position.

96.     Defendants' policies and practices barred Plaintiff from the Associate Commissioner position, in violation of his rights under Title VII and the New York State laws cited herein.

97.     The pre-selection process directly violated the New York State constitutional requirement that appointments to civil service positions should be based on merit and fitness.

98.     Ms. Brown developed the Associate Commissioner position specifically for Ms. Hamblin and gave her (Ms. Hamblin) preferential treatment by pre-selecting and offering Ms. Hamblin

the position.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

National Origin-Based Discrimination (Disparate treatment/impact) in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)

99.    Plaintiff incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 98, above.

100.    Section 703 of Title VII, 42 U.S.C. § 2000e-2, prohibits employment practices that discriminate against persons on the basis of their national origin. Plaintiff is informed and believe and thereon allege that Defendants' internal employment/promotional policies and/or practices that allowed for pre-selection of candidates, manipulation of postings, short posting notices (less than the required 10 days), and use of a selection process that lacked objective selection criteria, had an adverse and disproportionate impact on him because of his national origin, Nigerian.

101.    Defendants discriminated against Plaintiff by treating him differently from his female and white male coworkers, including in assignment of responsibilities, unequal wages, and compensation, because of his national origin.

102.    Defendants' employment decisions and/or practice, to be proven at trial, were neither manifestly job-related nor consistent with business necessity.

103.    Less discriminatory alternatives policies exist to achieve Defendants' business purposes.

104.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff right to be free from discrimination based on national origin.

## SECOND CLAIM FOR RELIEF
National Origin-Based Discrimination (Hostile Work Environment) in Violation of
Title VII of the Civil Rights Act of 1964, as amended,
42 U.S.C. § 2000e-2(a)

105.    Plaintiff incorporate by reference as if fully set forth herein the allegations contained in

paragraphs 1 through 104, above.

106.    Plaintiff was subjected to harassment by Defendants' agents and employees, including

Ms. Brown, Mr. Thottam, and Mr. Dowling, because of his national origin, Nigerian.

107.    Plaintiff was subjected to verbal and written unwelcomed conduct, and internal

employment policies by Defendants' agents and employees, including Ms. Brown, Mr. Thottam,

and Mr. Dowling.

108.    Defendants' agents and employees' comments and conduct were not welcomed by

Plaintiff.

109.    Defendants' agents' and employees' conduct was undertaken because of Plaintiff's

national origin, Nigerian.

110.    The conduct was so severe or pervasive that reasonable persons in Plaintiff's position

would find their work environment to be hostile or abusive.

111.    Plaintiff believed his work environment to be hostile or abusive as a result of Defendants'

agents' and employees' conduct.

112.    Executive management employees knew, or should have known, of the abusive conduct.

Plaintiff provided executive management, including Ms. Elizabeth Cassio, Mr. John Sudnik,

Chief of Department, Ms. Laura Kavanaugh, and Mr. Thottam, with information sufficient to

raise a probability of national origin harassment in the mind of a reasonable employer.

113.    The harassment was so pervasive and open that a reasonable employer would have

had to have been aware of it. Indeed, executive management employees were themselves

complicit in the abusive conduct.

22

114.    Defendants did not exercise reasonable care to prevent harassment in the workplace on
the basis of national origin, and did not exercise reasonable care to promptly correct any
harassing behavior that did occur.

115.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with
reckless disregard to Plaintiffs' right to be free from discrimination based on national origin.

### THIRD CLAIM FOR RELIEF
Sex-Based Discrimination in Violation of
Title VII of the Civil Rights Act of 1964, as amended,
42 U.S.C. § 2000e-2(a)

116.    Plaintiff incorporate by reference as if fully set forth herein the allegations contained
in paragraphs 1 through 115, above.

117.    Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer,
"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against
any individual with respect to his compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or national origin; or (2) to limit,
segregate, or classify his employees or applicants for employment in any way which would
deprive or tend to deprive any individual of employment opportunities or otherwise adversely
affect his status as an employee, because of such individual's race, color, religion, sex, or
national origin." 42 U.S.C. § 2000e-2(a).

118.    Defendants discriminated against Plaintiff by treating him differently from his
female coworkers, including in consideration for senior managerial position, unequal wages, and
compensation, because of his gender/sex.

119.    Plaintiffs' gender/sex was the determining factor and/or a motivating factor in
Defendants' conduct.

120.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with
reckless disregard to Plaintiffs' right to be free from discrimination based on gender/sex.

**FOURTH CLAIM FOR RELIEF**
Discrimination in Violation of
The Age Discrimination in Employment Act of 1967, as amended,
29 U.S.C. § 623

121.    Plaintiff incorporate by reference as if fully set forth herein the allegations contained

in paragraphs 1 through 120, above.

122.    Section 263 (a) of The Age Discrimination in Employment Act of 1967, as amended,

makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or

otherwise discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's age."

123.    Plaintiff is informed and believe and thereon allege that Defendants' internal employment

decisions, policies and/or practices had an adverse and disparate impact

on him because of his age.

124.    Ms. Brown followed through with her comments about putting new blood into HR,

taking extraordinary steps to select and appoint younger candidates into HR positions. At the

time, Marie Giraud, was about 37 years old, Bridget Hamblin, 40 years old, and Ayana Brooks,

also about 40 years old. Plaintiff was about 60 years old.

125.    In selecting these candidates, Ms. Brown clearly demonstrated a preference for younger

female applicants. By contrast, Plaintiff was denied opportunity for advancement and given an

ultimatum to leave the bureau of HR.  Ms. Brown's employment decisions including her

selection of candidates that were 40 years and younger, and her ultimatum for Plaintiff to

leave the FDNY bureau of HR, were discriminatory, and adversely treated and/or impacted

Plaintiff.

126.    Defendants discriminated against Plaintiff by treating him differently from his younger,

less experienced and less qualified female employees who were selected and appointed into

24

senior managerial positions, including in assignment of responsibilities, unequal wages, and compensation, because of his age.

127.     Plaintiff's age was the determining factor and/or a motivating factor in Defendants' actions.

128.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on age.

### FIFTH CLAIM FOR RELIEF
Retaliation in Violation of
Title VII of the Civil Rights Act of 1964, as amended,
42 U.S.C. § 2000e-3(a)

129.     Plaintiff incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 128, above.

130.     Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against an employee "because [he] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

131.     Plaintiff made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on national origin, race, and gender/sex.

132.     After Plaintiff filed his complaint with the EEOC on September 12, 2019, FDNY significantly reduced his duties and excluded him from decision-making responsibilities in retaliation against him. Plaintiff suffered loss of responsibility commensurate with his knowledge, qualifications and skills, and assignment of his responsibilities to a subordinate. Plaintiff was assigned tasks that did not provide any significant characteristics of work: meaningfulness, responsibility and knowledge of outcome. Noteworthy is the low level of "Task Significance." Plaintiff is informed and believed that he was being constructively frustrated and pushed out of FDNY. Plaintiff also suffered the loss of his functional title and staff under

25

his supervision.

133.    Plaintiff received threats of reassignment, constructive threats of termination, and was ostracized from department meetings, agency functions and events.

134.    In reducing Plaintiff's responsibilities, FDNY caused material harm, precluding him from fair and equitable compensation with similarly situated employees. FDNY's discretionary compensation policy was based on an employee's responsibilities. During this period, FDNY gave salary increases to selected employees, the names of which will be provided at trial.

135.    When Plaintiff was forced to transfer to BTDS, he reported directly to the Chief Information Officer ("CIO")/Associate Commissioner (BTDS organization charts). However, on September 3, 2020, Defendants changed Plaintiff's reporting relationship, compelling him and the other black male Director, Kevin Jones, Director of Fire CAD, to report to an internally created Senior Director position that elevated primarily female and white employees.

136.    Plaintiff was excluded from staff meetings and projects Defendants and Mr. Thottam knew he was working on when he was in the bureau of HR. Plaintiff's direct reporting relationship to the CIO was the agreement with the Deputy Commissioner of Life Safety Systems and the CIO, prior to his transfer. The FDNY treated Plaintiff differently from his peers in "Director" roles. By contrast, the CIO accepted the request to re-designate the office title of the "Director of Security" to "Chief Security Officer", while Plaintiff's request to define his office title was ignored. This disparate treatment, directly led to the departure of Plaintiff, one of two (2) black male "Directors" in BTDS from FDNY. Presently, there are no black male "Directors" at the FDNY Bureau of Technology Development.

137.    Mr. Thottam was aware that Thomas Dowling had made false accusations that were used by Ms. Brown against Plaintiff in Defendant's response to the Employment Opportunity

Commission ("EEOC"), but proceeded with the change in reporting structure. The circumstances of this alleged delay have already been explained and shown to be harassment of Plaintiff.

138.    Plaintiff asserts that because Defendants raised criticism of his performance that was never before brought to his attention, which contains false statements about him, FDNY engaged in retaliation and continued to take adverse actions against him.

139.    Defendants also made allegations against Plaintiff regarding a purported failure to report EEO violation by Michael Fellner, an employee assigned to CID, against Ms. Margaret Quinn-Puppa, the then Director of CID. At no time was Plaintiff informed that Ms. Quinn-Puppa violated EEO or Anti Bullying policies. He was never previously informed that there was an apparent allegation of failure to report against him. This was an attempt by FDNY to implicate, intimidate, and harass Plaintiff about misconduct after he had filed a charge of discrimination.

140.    Defendants made constructive attempts to push Plaintiff out of FDNY. On February 8, 2021, Mr. Thottam sent a text message to Plaintiff, suggesting that he should look at pending legislation about early retirement. In addition, on March 18, 2021, Balie Keown, Senior Investigator at DOI, suddenly contacted Plaintiff to commence background investigation for his promotion to Manager Level 2 on February 21, 2016, more than five years later.

141.    As a result of Plaintiff complaints, Defendants' agents and employees took materially adverse actions against Plaintiff, including, but not limited to, exclusion from meetings, reduction in responsibility, loss of staff under his supervision, and threats of termination aimed specifically at Plaintiff.

142.    Defendants' adverse actions constituted retaliatory workplace harassment.

143.    Plaintiff found his work environment to be hostile or abusive as a result of Defendants' agents and employees' conduct.

27

144.   Defendants' retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

## SIXTH CLAIM FOR RELIEF
Sex-Based Pay Discrimination in Violation of
Equal Pay Act, 29 U.S.C. § 206(d)(1)

145.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 144, above.

146.   Section 206(d)(1) of the Equal Pay Act makes it unlawful for an employer "to discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, efforts, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system, (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."

147.   Defendants had employed Plaintiff in job of Director/Executive Program Specialist, which required substantially high skills, effort, and responsibility. The scope of Plaintiff's responsibilities compared to the female and white male comparators, to be proven at trial, were substantially higher.

148.   Though Plaintiff had substantially more experience, he was paid a lower wage than the female and white employees performing their jobs under similar working conditions. Ms. Hamblin's yearly salary, based on the posting for the position, was between $140,000 to $175,000. Ms. Giraud received a salary adjustment of about $70,000 ($90,000 to $162,000). Plaintiff was not similarly treated. Plaintiff was earning $124,164, at the time.

149.   The differential in pay between Plaintiff and comparator female employees was not due to a bona fide seniority system, a bona fide merit system, or a bona fide system that

measured employee earnings by quantity or quality of work,[6] nor was the difference in pay a result of a factor other than gender/sex, race, and national origin.

150.    Defendants caused or contributed to the continuation of wage rate discrimination based on gender/sex, in violation of the Equal Pay Act.

151.    As a direct, legal and proximate result of the discrimination against Plaintiff in the claims contained in paragraphs 99 through 150, fully set forth herein by reference, Plaintiff sustained and continued to sustain, economic damages to be proven at trial. As a result of Defendants' actions, Plaintiff suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for equal pay violations, including liquidated damages for all willful violations, prejudgment interest, fees and costs, and other compensation pursuant to 29 U.S.C. § 216(b).

152.    Plaintiff is entitled to reasonable fees and costs of this case for the claims contained in paragraphs 99 through 150, by reference fully set forth herein.

## STATE LAW CLAIMS
### SEVENTH CLAIM FOR RELIEF
National Origin-Based Discrimination (Disparate Impact) in Violation of
New York State Human Rights Law, (§ 296); New York City Human Rights Law (§§ 8-107(1)(a) and (d), 8-107.13, and 8-107.1)

153.    Plaintiff incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 152, above.

154.    New York State Human Rights Law makes it unlawful for an employer to discriminate against an individual "in compensation or in terms, conditions or privileges of employment" because of national origin and ancestry.

---

[6] The positions of Associate Commissioner and Assistant Commissioners CID and HR, were not based on any objective evaluation criteria, such as job analysis or managerial allocation criteria.

155.    Plaintiff is informed and believe and thereon allege that Defendants' internal employment/promotional policies and/or practices had an adverse and disproportionate impact on him because of his national origin, Nigerian.

156.    Defendants' internal employment/promotional policies and/or practices sited herein were neither manifestly job-related nor consistent with business necessity.

157.    Less discriminatory alternatives policies exist to achieve Defendants' business purposes.

158.    As a direct, legal and proximate result of the discrimination, Plaintiff sustained, and continued to sustain, economic damages to be proven at trial. Defendants' conduct was so severe or pervasive that Plaintiff suffered emotional distress, resulting in damages in an amount to be proven at trial.

159.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on national origin and ancestry.

**EIGHTH CLAIM FOR RELIEF**
National Origin-Based Discrimination (Hostile Work Environment) in Violation of
New York State Human Rights Law (§ 296); New York City Human Rights Law (§§ 8-107(1)(a)
and (d), 8-107.13

160.    Plaintiff incorporate by reference as if fully set forth herein allegations contained in paragraphs 1 through 159, above.

161.    Plaintiff was subjected to harassment and marginalization by Defendants' agents and employees, including Ms. Brown and Mr. Thottam, because of Plaintiff's national origin.

162.    Plaintiff was subjected to verbal and written conduct, as well as through internal employment/promotional policies and/or practices, by Defendants' agents and employees, including Ms. Brown, Ms. Kavanaugh, Mr. Thottam, and Mr. Dowling.

163.    Defendants' agents and employees' conduct was not welcomed by Plaintiff.

164.    The conduct was so severe or pervasive that a reasonable person in Plaintiff's

position would find Plaintiff's work environment to be hostile or abusive.

165    Plaintiff found his work environment to be hostile or abusive as a result of Defendants' agents and employees' conduct directed specifically at Plaintiff.

166.    Executive management employees knew, or should have known, of the abusive conduct. Plaintiff provided management, including Ms. Cassio, Mr. Sudnik, Ms. Kavanagh, and Mr. Thottam, with enough information to raise a probability of national origin and ancestry harassment in the mind of a reasonable employer, and/or the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it. Indeed, executive management employees were themselves complicit in the abusive conduct.

167.    Defendants did not exercise reasonable care to prevent harassment in the workplace on the basis of national origin and ancestry, and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

168.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on national origin and ancestry.

**NINTH CLAIM FOR RELIEF**
Sex-Based Discrimination in Violation of
New York State Human Rights Law (§ 296); the New York City Human Rights Law (§§ 8-107(1)(a) and (d), 8-107.13

169.    Plaintiffs incorporate by reference as if fully set forth herein allegations contained in paragraphs 1 through 168, above.

170.    New York State Human Rights Law makes it unlawful for an employer to discriminate against an individual "in compensation or in terms, conditions or privileges of employment" because of sex.

171    Defendants discriminated against Plaintiff by treating him differently from his female and white male coworkers, including in assignment of responsibilities, unequal wages, and compensation, because of his gender/sex.

172.    Plaintiff sex was the determining factor and/or a motivating factor in Defendants' actions.

173.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on gender/sex.

**TENTH CLAIM FOR RELIEF**
Sex-Based Discrimination in Wages in Violation of
New York State Human Rights Law (§ 296), New York State Labor Law (§ 194)

174.    Plaintiff incorporate by reference as if fully set forth herein allegations contained in paragraphs 1 through 173 above.

175.    New York State Human Rights and Labor Laws prohibits an employer from unlawful discrimination of an employee in one or more protected class in the rate of pay because of his or her gender/sex.

176.    Defendants employed Plaintiff and female employees at FDNY to manage human resources, requiring specific professional and management skills, and responsibility.

177.    Plaintiff and female comparators performed their jobs under similar working conditions.

178.    Plaintiff was treated differently and paid a lower wage than the female employees doing substantially less work than required.

179.    The differential in pay between Plaintiff and female employees was not based on a reasonable factor or factors other than gender/sex.

180.    Defendants caused, contributed to, or caused the continuation of wage discrimination based on gender/sex, in violation of New York State Human Rights and Employment laws.

**ELEVENTH CLAIM FOR RELIEF**
Retaliation in Violation of the
New York State Human Rights Law ("NYSHRL" § 296)

181.    Plaintiff incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 180, above.

182.    It is unlawful under New York State Human Rights Law for an employer to take action "against any person because that person based on opposition to practices forbidden by this

article or filing a complaint, testifying or assisting in any proceeding under this article . . .".

183.    Plaintiff made informal and formal complaints to Defendants' agents and employees

opposing Defendants' unlawful, discriminatory employment practices based on national origin

and gender/sex.

184.    Plaintiff complaints were made reasonably and in good faith.

185.    As a result of Plaintiff complaints, Defendants' agents and employees took adverse

actions against Plaintiff including, but not limited to, exclusion from meetings, reduction in

responsibilities, threats of reassignment, assignment of his responsibilities to subordinates,

constructive threats of termination, and reduction in responsibilities to exclude him from

pay increases.  The reduction of Plaintiff's responsibilities caused material harm because,

Plaintiff was precluded from receiving a pay increase from FDNY discretionary compensation

policy which was based on an employee's responsibilities.

186.    As a direct, legal and proximate result of the discrimination against Plaintiff contained in

the State of New York claims in paragraphs 153 through 185, fully set forth herein by reference,

Plaintiff sustained, and continued to sustain, economic damages to be proven at trial. As a result

of Defendants' actions, Plaintiff suffered emotional distress, resulting in damages in an amount

to be proven at trial. Plaintiff further seeks compensatory and punitive damages, injunctive,

declaratory, and monetary relief available for discrimination and equal pay violations at trial,

including liquidated damages, prejudgment interest, fees and costs, and other compensation

pursuant to Title VII (§ 708), NYSHRL (§ 299), and NYCHRL (§ 8-124).

187.    Plaintiff is entitled to reasonable fees and costs of suit for the State of New York claims

contained in paragraphs 153 through 185, by reference fully set forth herein.

### PLAINTIFF'S PRIMA FACIE CASE

188.    Plaintiff has shown that Defendants engaged in discriminatory employment practices

33

and made employment decisions that disparately treated and impacted Plaintiff in violation of his rights under Title VII. Defendants conduct and compensation decisions showed obvious and/or implicit bias, on the basis of Plaintiff's national origin, race, and gender/sex. Defendants and Agents were aware of Plaintiff's race, gender/sex, and national origin/foreign-born status, and therefore, a member of several protected classes, when they engaged in discriminatory conduct against Plaintiff.

189    Plaintiff's qualifications and fitness for the position for which he was barred were never objectively assessed.

190.    Plaintiff is suing to enforce his rights as a black American male, under Title VII, as amended, the Equal Pay Act of 1963, ADEA, 1967, NYSHRL (§ 296), and New York State Labor Law (§ 194), to be free of discrimination based on his race, gender/sex, national origin/ancestry or age.[7]

## DECLARATORY RELIEF ALLEGATIONS

191.    A present and actual controversy exists between Plaintiff and Defendants concerning his rights and respective duties. Plaintiff contend that Defendants violated his rights under Title VII as amended, New York State Human Rights Law (§ 296), and New York State Labor Law (§ 194). Plaintiff is informed and believe and thereon allege that the Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate.

192.    Plaintiff seek a judicial declaration of the rights and duties of the respective parties.

193.    No plain, adequate, or complete remedy at law is available to Plaintiff to redress

---

[7] In *United States v. City of New York; Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i))*. "To make this showing, a Plaintiff must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two." *Id.* at 160. *See also,* the statistical significance analysis performed by, Bernard R. Siskin, Ph.D., that establishes a prima facie case of disparate impact at FDNY. (USA Mem. 2.); the statistical significance analyses performed by, Joel P. Wiesen, Ph.D., all establish a prima facie case.

the wrongs addressed herein.

194.    If this Court does not grant the relief sought herein, Plaintiff will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for relief as follows:

1.    For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful;

2.    Issue a permanent injunction enjoining Defendants to abolish their discriminatory employment and promotional practices, and require Defendants to take such affirmative action as is necessary to ensure that the effects of their unlawful employment practices are eliminated at FDNY;

3.    Order Defendants to grant Plaintiff retroactive compensation comparable to the promotional opportunity granted to Ms. Giraud;

4.    Direct Defendants to appoint an agreed upon independent monitor to review the FDNY's policies and practices and to initiate and enforce remedial steps to cure discriminatory employment policies/practices and to further investigate enforcement of any orders of this Court with regard to equitable and curative relief and to report on its findings;

5.    Order Defendants to complete an independent audit of personnel actions under Ms. Brown's oversight, for compliance with Title VII and NYS Human Right Law at FDNY. Actions to be audited should include the creation of positions, job analyses, development of Managerial Position Descriptions, and Job Posting Notices, review of all electronic applications, vetting, and selection of candidates;

6.    Order the FDNY to develop written protocols for creating FDNY managerial positions that are classified as non-competitive, and for posting (announcing), vetting and selecting candidates to fill manager positions that are so classified;

7.     Hold Ms. Brown to the highest professional and ethical standards as the Chief Legal Counsel for FDNY and failure to utilize the very mechanisms established to prevent unlawful discrimination;

8.     Award Plaintiff compensatory and punitive damages due to Defendants' willful and intentional acts directed at Plaintiff;

9.     Award Plaintiff compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to be proven at trial;

10.     Award liquidated damages;

11.     Award Plaintiff interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

12.     Award such other and further relief as this Court deems just and proper.


Date: December 17, 2021

                                                            Respectfully submitted,

                                                            David Ogula
                                                            *Plaintiff Pro Se*
                                                            76 Ash Street
                                                            Valley Stream, NY 11580


**CC: By First-Class Mail and E-Mail**

Eugenia Fowlkes
Assistant Corporation Counsel
Attorney for Defendants
100 Church Street, Room 2-146
New York, New York 10007 (212) 356-1177
efowlkes @law.nyc.gov

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | David Ogula<br>76 Ash Street<br>Valley Stream, NY 11580 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2019-05506 | Perry Canales,<br>Supervisory Investigator | (929) 506-5318 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Perry A. Canales
Digitally signed by Perry A. Canales
DN: cn=Perry A. Canales, o=Equal Employment Opportunity
Commission, ou=New York District Office,
email=perry.canales@eeoc.gov, c=US
Date: 2020.09.30 19:02:13 -04'00'

| Enclosures(s) | For | 9/30/2020 |
|---|---|---|
|  | Judy A. Keenan,<br>District Director | (Date Mailed) |

cc:    Carol L. Moran
Director
NEW YORK CITY FIRE DEPARTMENT (NYFD)
9 MetroTech Center, Fourth Floor
Brooklyn, NY 11201



